# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                    Crim. No. 15-1020 MV

Angel Diaz-Rivera,

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Motion to Suppress Evidence [Doc. 22].  The Court, having considered the Motion, briefs, relevant law and being otherwise fully informed, finds that the Motion is not well-taken and will be denied.

## BACKGROUND

The Greyhound bus that travels east from California to New York has a stop, with a layover, at the Amtrak Train/Greyhound Bus Station in Albuquerque, New Mexico.  During that layover, the passengers who are continuing to points eastward disembark and wait in the terminal, while the bus is serviced, refueled, and cleaned in the maintenance shop, or "wash bay."  Once the bus is ready to depart, the bus returns to the terminal, and the passengers re-board to continue their journey.

DEA Special Agent ("SA") Jarrell Perry works on drug interdiction cases at the Albuquerque Train/Bus Station.  His goal is to intercept couriers transporting illegal narcotics from the southwestern area of the United States to the northeastern area of the United States and couriers transporting proceeds from the sale of illegal narcotics back from the northeast to the

1

southwest.  SA Perry has 17 years of experience with the DEA, and during that time has made over 1,200 seizures of drugs and/or drug proceeds.

On March 13, 2015, assisted by Task Force Officer ("TFO") Pedro Gutierrez, SA Perry was waiting at the Albuquerque Train/Bus Station for the eastbound Greyhound Bus to make its regularly scheduled stop.  He was wearing blue jeans and a green, long-sleeved, polo shirt, which concealed his gun and handcuffs.   His badge was in his pocket.

The bus arrived, the passengers disembarked, and the bus was driven over to the wash bay.  SA Perry, in conformity with his customary practice, went to the wash bay "to look at" the checked-in luggage stored in the three bins below the bus.  In particular, SA Perry was looking for "check tags" to see if the bags were coming from drug "source cities" or going to drug "destination cities," specific types of luggage typically used by drug couriers to carry drugs or drug proceeds in false compartments, and newly purchased luggage, which is often used by drug couriers.

Video surveillance from the wash bay demonstrates that SA Perry disembarked from the bus into the wash bay at 10:41:39 a.m.  With a flashlight in one hand, he opened the bin closest to the front of the bus.  He leaned into the bin, and appears to have been shifting bags with his free hand while shining his light on the bags and their tags, as he moved toward the back of the bin.  At 10:42:15 a.m., he closed the first bin.

At 10:42:22 a.m., SA Perry opened the second bin.  He leaned into the bin up to his waist, leaving only his body from the waist down visible to the camera; from the video recording, his hands cannot be seen.  At 10:42:33 a.m., TFO Gutierrez walked into the wash bay, and began peering into the bin alongside SA Perry.  At 10:42:54 a.m., SA Perry emerged from

the bin, and engaged in a conversation with TFO Gutierrez. During the conversation, the two men made hand gestures that included a gesture holding their thumb and index finger about an inch distance apart.

At 10:43:25 a.m., SA Perry reached into the second bin and pulled out what appears to be a bag. He and TFO Gutierrez held the bag up between them. TFO Gutierrez had his back to the camera, and his body obscured the camera's view of the bag. SA Perry returned the bag to the bin at 10:43:36 a.m., looked into the bin for a bit longer, and closed the bin at 10:43:48 a.m.

At 10:43:56 a.m., SA Perry opened the third bin. He leaned into the bin and appears to have been handling the bags. TFO Gutierrez leaned on the side of the bus and looked into the bin. SA Perry removed a bag from the bin, and leaned it alongside the bus; he returned to the third bin, leaning into the bin up to his waist. Again, only his body from the waist down is visible, and his hands cannot be seen from the video. TFO Gutierrez looked into the bin again, and then walked out of the wash bay. At 10:45:15 a.m., SA Perry replaced the bag into the bin, continued to examine the bags in the bin, and then closed the bin at 10:45:42 a.m. At that point, he walked out of the wash bay.

While looking at the bags in the bins, Agent Perry identified one bag that caught his interest. He described the bag as a black expandable bag, with a thin board on the bottom, small wheels all around it, a large strap on top, and zippers along the sides that can be opened to expand the size of the bag. Agent Perry had seen the same type of bag in the past used to carry drugs and drug proceeds in a hidden compartment in the bottom. Agent Perry looked at the luggage tag on the bag, which had the name "Angel I. Diaz" written on it and indicated that the bag had been checked in San Diego, California, and was destined for New York. SA Perry

showed the bag to TFO Gutierrez, explained to him that it was the type of bag often used to conceal illegal narcotics in hidden compartments on the bottom, and shared with him the identifying information on the luggage tag.

Thereafter, SA Perry and TFO Gutierrez boarded the bus.  SA Perry stood near the back of the bus, waiting for the passengers in the terminal to re-board.  TFO Gutierrez stood in the front of the bus, in the seat across from the driver, where the driver puts his or her personal belongings.  Neither SA Perry nor TFO Gutierrez blocked the aisle.

As the passengers entered the bus, SA Perry began questioning them.  SA Perry questioned four passengers.  Defendant was among those he questioned.

Defendant boarded the bus and sat down two or three rows from the back of the bus, on the left-hand side, in the aisle seat.  SA Perry stood behind him, displayed his DEA badge, identified himself as a police officer, and asked to speak to him for a moment.  Defendant responded, "Yeah."  SA Perry then asked where he was traveling to.  Defendant looked puzzled; SA Perry believed that Defendant did not understand what he was saying.  At that point, SA Perry asked Defendant if he spoke English, and Defendant responded, "No."  SA Perry then asked if he spoke Spanish, to which Defendant responded, "Yes."  SA Perry displayed his DEA badge again, and then proceeded to speak to Defendant in Spanish.  The following is the English translation of the exchange that ensued in Spanish.

| | |
|---|---|
| SA Perry: | I am a police officer. |
| Defendant: | Okay. |
| SA Perry: | Will you allow me to speak to you? |
| Defendant: | Yes. |
| SA Perry: | What is your destination? |
| Defendant: | Uh, New York. |
| SA Perry: | Okay.  New . . . Where are you coming from? |
| Defendant: | From Tijuana. |
| SA Perry: | Tijuana? |

4

| | |
|---|---|
| Defendant: | Yes. |
| SA Perry: | Your ticket please. |
| Defendant: | Yes. |
| SA Perry: | Thank you, sir. Angel I. Diaz? |
| Defendant: | Mh-hm. |
| SA Perry: | Thank you. Your, uh . . . identification, please. So where do you live sir? |
| Defendant: | In Tijuana. |
| SA Perry: | Tijuana? |
| Defendant: | Yes. |
| SA Perry: | How many days in New York? |
| Defendant: | Mmm, two days. |
| SA Perry: | Oh, okay. |
| Defendant: | I'm only going for two days. |
| SA Perry: | Uh, for . . . vacations, family? |
| Defendant: | No, work. I'm going to take back some trucks my boss purchased. |
| SA Perry: | Okay. |
| Defendant: | He is going to want me to take one of his trucks back. |
| SA Perry: | Your ticket? |
| Defendant: | I'm the driver. |
| SA Perry: | Oh. |
| Defendant: | Driver. |
| SA Perry: | Thank you. |
| Defendant: | Here, look. |
| SA Perry: | Angel I. Ibes . . . |
| Defendant: | Ah-hah. |
| SA Perry: | Diaz Rivera. |
| Defendant: | Yes. |
| SA Perry: | January 1, 76, okay. Do you have luggage, sir? |
| Defendant: | Yes. |
| SA Perry: | Where? |
| Defendant: | Uh, here, underneath. |
| SA Perry: | The luggage here? |
| Defendant: | Ah-hah, uh (unintelligible) a backpack. |
| SA Perry: | Will you allow me to search . . . |
| Defendant: | Yes. |
| SA Perry: | Thank you. |

Pause in conversation.

| | |
|---|---|
| SA Perry: | Thank you, sir. And . . . will you allow me to search for contraband in your luggage underneath? |
| Defendant: | Mh-hm. |
| SA Perry: | Yes? Okay, thank you, sir. Thank you very much, okay? |

Pause in conversation.

SA Perry:          Thank you, sir. Okay.

It was not until SA Perry saw the name on Defendant's ticket – Angel I. Diaz – that he realized

that Defendant was the owner of the checked bag that had caught his attention in the wash bay.

Once SA Perry switched to Spanish, Defendant appeared to understand what SA Perry

was asking.  He answered his questions immediately and responded appropriately to each

question that SA Perry asked.  SA Perry handed Defendant's identification back to him after

reviewing it.  During his questioning, SA Perry kept his gun and handcuffs concealed, spoke

softly, remained behind Defendant, and did not block Defendant's way to the aisle.  At no point

did Defendant indicate that he wanted to terminate the encounter with SA Perry.

After receiving Defendant's consent to search both his carry-on and checked luggage, SA

Perry searched Defendant's backpack, which was in the empty window seat beside Defendant,

and returned it to Defendant.  After SA Perry talked with one or two other passengers, SA Perry

and TFO Gutierrez exited the bus to search Defendant's checked bag.  As they were exiting the

bus, SA Perry pointed Defendant out to TFO Gutierrez, stating, "That's Diaz."

SA Perry retrieved Defendant's bag from the bin below the bus, unzipped it, removed the

contents, and felt a hidden compartment on the bottom between two boards.  SA Perry opened

the hidden compartment and found a clear, heat-sealed, plastic bundle, which appeared

consistent with the packaging of illegal narcotics.  At that point, SA Perry and TFO Gutierrez re-

boarded the bus and handcuffed Defendant, placing him under arrest.

While SA Perry questioned passengers on a nearby Amtrak train, Defendant sat in TFO

Gutierrez's car with TFO Gutierrez.  Defendant began asking questions of TFO Gutierrez and

making unsolicited statements.  TFO Gutierrez, in Spanish, orally advised Defendant of his

*Miranda* warnings, but did not obtain a written waiver from Defendant.  Defendant then stated

that he was out of work and needed money, and that someone had offered to pay him $800 to

transport the bag to New York.  He further stated that he believed that the bag contained

marijuana.  Neither TFO Gutierrez's advisement of Defendant's *Miranda* rights, nor Defendant's

admissions, were recorded.

SA Perry and TFO Gutierrez transported Defendant to the DEA office, where he was

strip-searched and placed into a holding cell.  The search was conducted in an open, well-lighted,

and heated area.  During this process, Defendant repeated his earlier statements, namely that he

believed that the substance that he was transporting was marijuana, and that he was told that he

would be paid $800 for delivering it.  No threats were made to Defendant either in TFO

Gutierrez's car or at the DEA office.  When SA Perry and TFO Gutierrez were taking

Defendant's personal information, Defendant advised that he did not wish to make any further

statements.

At the DEA office, SA Perry and TFO Gutierrez conducted a field test of the substance

found in Defendant's bag.  The substance field tested positive for both cocaine and

methamphetamine.  Based on that result, Defendant was charged in a criminal complaint with

possession of methamphetamine and cocaine.  A subsequent test performed at the DEA

laboratory, however, revealed that the substance was, in fact, fentanyl, a synthetic opiate.  SA

Perry has had only one prior seizure of fentanyl in his experience with the DEA.  To his

knowledge, there is no field test for fentanyl, as it is considered a "hazardous material."

On March 24, 2015, an Indictment was returned charging Defendant with possession with intent to distribute a Schedule II Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and (b)(1)(C).  On September 14, 2015, Defendant filed his Motion to Suppress Evidence [Doc. 22], seeking suppression of the drugs found in his bag, and the statements he made to TFO Gutierrez and Agent Perry subsequent to his arrest.  The government filed a response in opposition on October 9, 2015, Doc. 26, and Defendant's reply followed on October 22, 2015.  Doc. 28.  The Court held an evidentiary hearing on the motion on December 3, 2015.  At the hearing, the Court heard testimony from SA Perry.  Both a video recording of SA Perry's activities in the wash bay and an audio recording of SA Perry's encounters on the bus were admitted into evidence.  At the conclusion of the hearing, the Court took Defendant's motion under advisement.

**DISCUSSION**

Defendant argues that the "irresistible conclusion" from all of the evidence is that, when SA Perry was in the wash bay, his tactile inspection of Defendant's bag amounted to a search, which, because it was performed without a warrant and without consent, violated the Fourth Amendment.  Defendant further argues that because SA Perry "saw something" during that illegal search, he targeted Defendant for questioning, thereby exploiting the illegality of the search to secure both Defendant's consent to search his bag and Defendant's admissions.  Because his consent to search and his confession were tainted by the illegal search, Defendant's argument continues, the evidence found during SA Perry's search of Defendant's bag and Defendant's post-arrest statements must be suppressed as fruit of the poisonous tree.  Finally, Defendant argues that even if SA Perry did not illegally search Defendant's bag before

questioning him, the totality of the circumstances indicates that Defendant's consent to search was not voluntary.  For this reason alone, Defendant argues, the evidence discovered pursuant to the search of his bag must be suppressed.

As described herein, Defendant has not established by a preponderance of the evidence that, while in the wash bay, SA Perry searched Defendant's bag in violation of the Fourth Amendment.  Accordingly, neither Defendant's consent to search nor his admissions were tainted by a prior illegality.  Also as described herein, the government has established by a preponderance of the evidence that, under the totality of the circumstances, Defendant's consent to search was voluntary.

I.       The Alleged "Pre-Search" of Defendant's Bag

A.       Legal Standard

The Fourth Amendment protects the "right of the people to be secure in their . . . effects, against unreasonable searches."  U.S. Const. amend. IV.  "A search for purposes of the Fourth Amendment occurs when government officials violate an individual's legitimate expectation of privacy."  *United States v. Nicholson*, 144 F.3d 632, 636 (10th Cir. 1998).  A search undertaken without a warrant, subject only to a few, well-established exceptions, is per se unreasonable under the Fourth Amendment.  *Id.* at 638.   "When a defendant moves to suppress evidence obtained as a result of an allegedly unconstitutional search, he has the burden of demonstrating a subjective expectation of privacy that society is prepared to recognize as reasonable."  *Id.*; *see also United States v. Johnson*, No. 07-30955, 2008 WL 3876550, at *2 (5th Cir. Aug. 21, 2008) ("The defendant bears the burden of establishing a reasonable expectation of privacy by a preponderance of the evidence.").

9

"Travelers have a legitimate expectation of privacy in their personal luggage, which the Fourth Amendment protects." *Nicholson*, 144 F.3d at 638. Nonetheless, "not every investigative technique which reveals something about the contents of a traveler's luggage constitutes a search within the meaning of the Fourth Amendment." *Id.* In particular, "the use of sensory perception does not necessarily constitute a search," and, accordingly, an agent's "touching of a bag's exterior does not necessarily constitute a search." *Id.* at 636-37. Rather, it is "[t]he degree of intrusion that is the determining factor as to whether an officer's contact with the exterior of luggage constitutes a search under the Fourth Amendment." *Id.* at 639.

In *Nicholson*, the detective testified that he removed Defendant's carry-on bag from the overhead rack and "manipulated" it. As a result, he detected "tightly wrapped bundles" inside the bag, which he believed to be illegal drugs. The Tenth Circuit found that because the manner of the detective's manipulation of the bag was one that "Defendant did not reasonably expect from other passengers," the detective conducted a search within the meaning of the Fourth Amendment. *Id.* at 639. Specifically, the Court noted:

> Detective Leach was not prepping the bag for a sniff. He never testified that he smelled Defendant's bag. Instead, Detective Leach worked Defendant's bag to determine whether it contained something of independent evidentiary value. Unlike a sniff, manipulating a bag with the hands may reveal much more than simply the likely presence of illegal drugs. To an extent, it reveals the contents of a bag, for example clothes, shoes, or toiletries, in which the owner has a legitimate expectation of privacy.

*Id.* The Court reached the following conclusion:

> We believe that by handling Defendant's carry-on bag in this manner, Detective Leach departed from the type of handling a commercial bus passenger would reasonably expect his baggage to be subjected, and entered the domain protected by the Fourth Amendment. When Detective Leach removed Defendant's carry-on bag from the overhead rack and conducted a tactile examination aimed at discovering the nature of the contents of the bag, he violated Defendant's reasonable expectation of privacy in the bag. Thus, Detective Leach's manner of

10

handling Defendant's carry-on bag constituted a search within the meaning of the Fourth Amendment.

*Id.*

The Court similarly found that another detective's manner of handling the defendant's checked suitcase in the cargo hold of the bus constituted a search, where the detective testified that he pressed on the sides of the bag "with his hands perpendicular to the ground and flat." *Id.* at 640. By pressing on the sides, the detective detected "several large bundles" inside it. The Court found that "Detective Wenthold's pressing on the sides of the suitcase with the palms of his hands in order to inspect its contents violated Defendant's reasonable expectation of privacy in the suitcase because it went beyond that type of contact which a passenger may reasonably expect when checking a bag with a commercial bus line." *Id.* at 640.

Similarly, in *Bond v. United States*, 529 U.S. 334, 336 (2000), an agent entered a bus, and squeezed the soft luggage in the overhead storage space above the seats as he walked from the back of the bus to the front. In particular, the agent squeezed the petitioner's green canvas bag and noticed that it contained a brick-like object, which later was revealed to be methamphetamine. The Supreme Court held that the agent's physical manipulation of the petitioner's bag violated the Fourth Amendment.

First, the Court found that, by his conduct, the petitioner had "exhibited an actual expectation of privacy . . . by using an opaque bag and placing that bag directly above his seat." *Id.* at 338. Next, the Court considered whether the petitioner's "expectation of privacy was one that society is prepared to recognize as reasonable." *Id.* The Court explained that "[w]hen a bus passenger places a bag in an overhead bin, he expects that other passengers or bus employees may move it for one reason or another. Thus, a bus passenger clearly expects that the bag may

11

be handled." *Id.* Nonetheless, the Court continued," [h]e does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner." *Id.* This, the Court found, "is exactly what the agent did here." *Id.* at 339. Accordingly, the Court held "that the agent's physical manipulation of petitioner's bag violated the Fourth Amendment." *Id.*

B.       Instant Case

Defendant argues that, like the officers in *Bond* and *Nicholson*, SA Perry violated Defendant's reasonable expectation of privacy by conducting a tactile examination of Defendant's bag which, because it was aimed at discovering the nature and contents of that bag, went beyond the type of contact that a passenger may reasonably expect when checking a bag with a commercial bus line. In support of this argument, Defendant first points to the stipulation submitted by the parties regarding the testimony that Jean Dumas, City Manager of the Albuquerque Bus Station, would have provided if he had been called as a witness at the suppression hearing. In particular, the stipulation indicates that, according to Mr. Dumas, while looking at checked luggage stored in the cargo hold of buses, SA Perry "will lift certain bags or squeeze the soft sided luggage or otherwise manipulate the outer portions of the luggage."

Next, Defendant describes the video of SA Perry's activities in the wash bay. While admitting that it is not possible to see what SA Perry was doing while he was leaning into the second cargo bin, Defendant argues that the video shows that, after SA Perry emerged from that bin, he and TFO Gutierrez were smiling, conversing, and making gestures about a bag that SA Perry had examined in the bin, including a gesture to suggest miming of a second, one-inch thick piece of plywood that he found in the bottom of a bag, creating a false compartment. Immediately thereafter, Defendant argues, SA Perry pulled a bag out from the second bin, and he

12

and TFO Gutierrez held it up between them, maybe even passing it back and forth, feeling and squeezing it, with TFO Gutierrez blocking the camera so that their activities could not be viewed.

Defendant further notes that, after leaving the wash bay, SA Perry conducted only four consensual encounters on the bus, which, he argues, is "pretty slim" for SA Perry's normal practice.  Additionally, Defendant notes that while SA Perry hurried through the other three encounters, in contrast, he secured Defendant's consent to search in "rapid-fire, targeted interrogation."  This targeting of Defendant, he argues, is underscored by the fact that, after completing the encounters, SA Perry pointed Defendant out to TFO Gutierrez, stating, "That's Diaz."

In summary, Defendant argues that SA Perry's recorded activities in the wash bay, viewed both in light of the proferred testimony of Mr. Dumas and in light of SA Perry's focus on Defendant once he boarded the bus, establish that SA Perry conducted an illegal search of Defendant's bag, either while SA Perry was leaning into the second bin of the cargo hold, when he removed a bag from that bin, or both.  As a result of that illegal search, Defendant's argument continues, SA Perry targeted Defendant in order to secure his consent to search.

The Court agrees, and the government does not dispute, that the evidence establishes that when he boarded the bus, SA Perry was looking for a specific passenger, namely the owner of the bag with a luggage tag bearing the name of Angel I. Diaz.  The Court, however, cannot agree that the evidence also establishes, by a preponderance of the evidence, that SA Perry conducted an illegal search of Defendant's bag prior to boarding the bus.  According to SA Perry's testimony, which the Court found credible, he was interested in finding and talking to the owner

of the bag bearing Defendant's name because he had seen the same type of bag in the past used to carry drugs and drug proceeds in a hidden compartment in the bottom.  SA Perry's actions and words, as captured on the video recording from the wash bay and the audio recording from the bus, are equally as consistent with SA Perry's credible testimony as they are with Defendant's proposed interpretation of SA Perry's actions and words.

As Defendant admits, when he was leaning into the second bin, SA Perry's hands were not visible.  It thus is equally likely that while he was leaning into the bins, SA Perry was looking at the types of bags and their luggage tags, as he testified, as it is that he was conducting a tactile examination of the contents of those bags, as Defendant argues.  Accordingly, Defendant has not established by a preponderance of the evidence that, while leaning into the second bin, or any other bin, SA Perry illegally searched Defendant's bag.

Similarly, as Defendant also admits, while SA Perry and TFO Gutierrez were holding up a bag between them, TFO Gutierrez's back was to the camera, and his body was obscuring the camera's view of the bag.  Only 11 seconds elapsed from the time that SA Perry removed the bag from the bin and the time that he returned the bag to the bin.  In those 11 seconds, it is equally likely (if not more likely) that SA Perry was showing TFO Gutierrez the bag and explaining to him that it was the type of bag often used to conceal illegal narcotics in hidden compartments on the bottom, as SA Perry testified, as it is that SA Perry and TFO Gutierrez were passing the back and forth, feeling and squeezing it, as Defendant argues.  Defendant thus has not established by a preponderance of the evidence that, while holding up the bag that he removed from the second bin, SA Perry illegally searched Defendant's bag.

14

Further, the conversation between SA Perry and TFO Gutierrez during which Defendant interprets their hand gestures to be indicating a bag with a second, one-inch thick piece of plywood is also consistent with SA Perry's testimony. Specifically, SA Perry testified that he showed Defendant's bag to TFO Gutierrez, explained to him that it was the type of bag often used to conceal illegal narcotics in hidden compartments on the bottom, and shared with him the identifying information on the luggage tag. Similarly, SA Perry's targeted interest in Defendant, once he was aware that Defendant was Angel I. Diaz, along with SA Perry pointing out to TFO Gutierrez that Defendant was "Diaz," is consistent with SA Perry's testimony that he wanted to speak with the passenger who had checked the bag that, upon his visual inspection, had caught his attention in the wash bay.

In short, Defendant has failed to establish, by a preponderance of the evidence, that SA Perry's interest in securing consent to search the bag of passenger Angel I. Diaz was the result of an illegal, tactile search of the contents of Defendant's bag. Because it is just as likely that SA Perry's interest in Defendant's bag was the result of his visual examination of that bag and its luggage tag, Defendant has failed establish, by a preponderance of the evidence, a violation of his reasonable expectation of privacy.

The stipulation regarding Mr. Dumas's potential testimony does not change this equation. Mr. Dumas's statement that SA Perry will "squeeze the soft sided luggage or otherwise manipulate the outer portions of the luggage," without any explanation as to how Mr. Dumas learned this information, is too theoretical and lacking in specificity to be of evidentiary value here. Indeed, Mr. Dumas's statement is accompanied by another seemingly contradictory statement that he believes that SA Perry "does not actually search the luggage of Greyhound Bus

Lines passengers without their consent." Read in context, Mr. Dumas's statement regarding SA Perry's manipulation of luggage, without specifics as to when, where, and how such manipulation was done, simply does not tip the balance in favor of Defendant's proposed interpretation of the events leading up to the encounter between Defendant and SA Perry.

Nor does Defendant's attempt to call into question SA Perry's credibility succeed in tipping the balance of the evidence in his favor. Defendant argues that SA Perry has made several "materially false statements," and that a witness who is false in one aspect of his testimony may be false in another aspect of his testimony. Specifically, Defendant notes that, in his affidavit in support of the criminal complaint filed against Defendant, SA Perry did not include any discussion of his activities in the wash bay. Further, in his affidavit, SA Perry miswrote Defendant's name as "Diaz-Rivera," and admitted his mistake during his grand jury testimony, describing it as a typographical error. At the hearing on the instant motion to suppress, however, SA Perry did not recall either that he had miswritten Defendant's name, or that he had testified to his mistake in front of the grand jury. Defendant also notes that Defendant was charged in the criminal complaint with possession of methamphetamine and cocaine, when, in fact, Defendant was in possession of fentanyl. Finally, Defendant notes that in his DEA-6 report, SA Perry indicated that Defendant was advised of his *Miranda* rights at the DEA Office, when, in fact, TFO Gutierrez advised Defendant of those rights while they were in TFO Gutierrez's car.

The Court is not convinced that any of the mistakes identified by Defendant rises to the level of "materially false statements." First, it is not clear that the omission from the criminal complaint of SA Perry's activities in the wash bay was improper. Second, the Court has no

reason to believe that SA Perry's miswriting of Defendant's name was anything other than a typographical error. Moreover, during the suppression hearing, there seemed nothing untoward about SA Perry's failure to remember his typographical error. Third, the evidence established that SA Perry properly conducted a field test of the drugs found in Defendant's bag, and that the drugs tested positive for methamphetamine and cocaine. The criminal complaint was drafted based on the results of the field test, before the DEA laboratory test came back with different, and conclusive, results. Accordingly, the mischarging in the criminal complaint cannot be characterized as a "mistake" on the part of SA Perry. Fourth, SA Perry was not present when TFO Gutierrez advised Defendant of his *Miranda* rights, and his mistake as to where and when TFO Gutierrez administered those rights appears to have been an innocent mistake. In summary, the Court does not find that any of the mistakes identified by Defendant constitute a "materially false statement" that would undermine the credibility of SA Perry's testimony at the suppression hearing.

For all of these reasons, the Court does not find, by a preponderance of the evidence, that while he was in the wash bay, SA Perry conducted an illegal search of Defendant's bag. As Defendant's consent to the search of his bag and his post-arrest statements thus did not follow a violation of his Fourth Amendment rights, neither the evidence discovered pursuant to his consent to search nor his post-arrest statements are subject to suppression as fruit of the poisonous tree.

II.     Defendant's Consent to Search

Defendant argues that, regardless of whether his consent to search followed a Fourth Amendment violation, the totality of the circumstances demonstrates that his consent was not

17

freely, voluntarily, and expressly given.   According to Defendant, the involuntary nature of his consent to the search of his bag provides a separate, independent basis for suppression of the evidence discovered pursuant to his consent to search.

      A.     <u>Legal Standard</u>

      Voluntary consent to search is an exception to the rule that a warrantless search violates the Fourth Amendment.  *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012). "Voluntary consent" consists of two parts:  (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given." *Id.*  In determining the voluntariness of consent, the Fourth Amendment requires that "consent not be coerced, by explicit or implicit means, by implied threat or covert force.  For, no matter how subtly the coercion is applied, the resulting consent would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973).  The government bears "the burden of proving that consent is given freely and voluntarily." *Jones*, 701 F.3d at 1318 (citation omitted).  "Further, the question whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Id.* (citation omitted).

      In *United States v. Bostick*, 501 U.S. 429 (1991), the Supreme Court addressed the specific question of drug interdiction efforts on buses.  In *Bostick*, two police officers requested a bus passenger's consent to a search of his luggage.  The passenger agreed, and the resulting search revealed cocaine in his suitcase.  The Florida Supreme Court suppressed the cocaine, adopting a *per se* rule that due to the cramped confines onboard a bus the act of questioning

would deprive a person of his or her freedom of movement and so constitute a seizure under the Fourth Amendment.  The Supreme Court reversed, "ma[king] it clear that for the most part *per se* rules are inappropriate in the Fourth Amendment context." *United States v. Drayton*, 536 U.S. 194, 201 (2002).  Rather, "[t]he proper inquiry necessitates a consideration of 'all the circumstances surrounding the encounter.'" *Id.* (quoting *Bostick*, 501 U.S. at 429).

The Court next noted that the traditional rule, which states that a seizure does not occur so long as a reasonable person would feel free to disregard the police and go about his business, is not an accurate measure of the coercive effect of a bus encounter.  A passenger may not want to get off a bus if there is a risk it will depart before the opportunity to re-board.  *Bostick*, 501 U.S. at 434-36. A bus rider's movements are confined in this sense, but this is the natural result of choosing to take the bus; it says nothing about whether the police conduct is coercive.  *Id.* at 436.  The Court held instead that the proper inquiry "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  *Bostick*, 501 U.S. at 436.

In *Bostick*, the Court deemed the following factors relevant to the Fourth Amendment reasonableness determination:  (1) whether the agent advised the defendant he had the right to refuse consent, (2) whether the agent in any way threatened the defendant (*i.e.*, the display of a weapon and/or the nature of the questioning), and (3) the particular location of the encounter.  Following *Bostick*, the Tenth Circuit similarly identified various factors relevant to whether a reasonable person would not feel free to terminate an encounter with police:

> The threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a

nonpublic place or a small, enclosed place; and absence of other members of the
public.

*United States v. Hill*, 199 F.3d 1143, 1147-48 (10th Cir. 1999).

In *Drayton*, the Supreme Court applied the *Bostick* framework to the facts of the case

before it and determined that the respondents' consent to the search of their luggage and their

persons was voluntary, explaining:

> Nothing Officer Lang said indicated a command to consent to the search. Rather,
> when Lang requested to search Brown and Drayton's persons, he asked first if
> they objected, thus indicating to a reasonable person that he or she was free to
> refuse. Even after arresting Brown, Lang provided Drayton with no indication
> that he was required to consent to a search. To the contrary, Lang asked for
> Drayton's permission to search him ("Mind if I check you?"), and Drayton
> agreed.

*Id.*

The Court specifically noted that although the officer "did not inform the respondents of

their right to refuse the search, he did request permission to search, and the totality of the

circumstances indicates that their consent was voluntary, so the searches were reasonable." *Id.* at

207. The Court rejected not only the notion that "police officers must always inform citizens of

their right to refuse when seeking permission to conduct a warrantless consent search," but also

the suggestion that "a presumption of invalidity attaches if a citizen consented without explicit

notification that he or she was free to refuse to cooperate." *Id.* Rather, the Court stated that "the

totality of the circumstances must control, without giving extra weight to the absence of this type

of warning." *Id.*

B.    The Instant Case

Defendant argues that his consent to search was not voluntary. As an initial matter,

Defendant argues that the audio recording of the encounter between Defendant and SA Perry

demonstrates that Defendant did not, in fact, consent to the search.  Specifically, while the transcription of the audio recording provided by the government reflects that, when SA Perry asked whether Defendant would allow him to search for contraband in his luggage underneath, Defendant responded, "Mh-hm," Defendant argues that he actually said, "Huh?" rather than "Mh-hm."  Defendant further asserts that following his response of "Huh?" SA Perry suggested the answer by saying, "Yes?  Okay, thank you sir."

The Court has listened to the audio recording, and finds the government's transcription to be accurate.  In response to SA Perry's request to search, Defendant responded in the affirmative with "Mh-hm."  The intonation of his voice was that of a declaratory statement, rather than a question.  Accordingly, the Court finds that Defendant did, in fact, expressly consent to the search of his checked bag.

The Court further finds that, applying the *Hill* factors, the government has met its burden of demonstrating that a reasonable person in Defendant's position would have felt free to decline SA Perry's request to search or otherwise terminate the encounter.  First, there was no "threatening presence of several officers."  To the contrary, the only officers on the bus were SA Perry and TFO Gutierrez.  Only SA Perry approached Defendant, near the back of the bus, while TFO Gutierrez remained at the front of the bus.  Second, neither SA Perry nor TFO Gutierrez "brandished" a weapon.  Rather, SA Perry kept his gun and his handcuffs concealed beneath his shirt.  Third, there is no evidence to suggest that SA Perry touched Defendant during the encounter.  Fourth, the audio recording demonstrates that SA Perry did not use "aggressive language or tone of voice" indicating that Defendant's compliance with his request to search was "compulsory."  In fact, SA Perry spoke in a neutral, polite tone and did not raise his voice.  Fifth,

SA Perry did not retain Defendant's personal effects for a prolonged period of time.  Rather, he returned to Defendant his identification and ticket within seconds, as soon as he had reviewed them.  Sixth, SA Perry did not ask Defendant to accompany him to the DEA office.  Seventh, while the encounter occurred in public, the space in which it occurred (a bus) was, in fact, small and enclosed.  Notably, however, SA Perry did not block Defendant's access to the aisle during the encounter.  Finally, the encounter occurred in the presence of other members of the public, namely, the other bus passengers.  Thus, other than the fact that the encounter occurred in the small, enclosed space of a bus, the remaining *Hill* factors demonstrate that a reasonable person would have felt free to terminate the encounter with SA Perry.

In disputing the voluntary nature of his consent, Defendant points to the fact that he was unaware of his right to refuse consent.  Admittedly, SA Perry did not inform Defendant of his right to refuse consent to search.  As discussed above, however, the Supreme Court in *Drayton* made clear that an officer is not required to inform citizens of the right to refuse consent to search, and that no presumption of invalidity attaches where such information is not provided.  Indeed, the Court stated that no "extra weight" is to be given to the absence of this type of warning, and that instead, the totality of the circumstances control.  536 U.S. at 201.  Here, as in *Drayton*, SA Perry requested permission to search, rather than commanding consent to search through his actions, tone, or words.  *See id.*  The totality of the circumstances thus indicates that Defendant's consent was voluntary.  *See id.*

Defendant further argues that his consent was not voluntary because of his education and intelligence and his lack of familiarity with the English language.  Defendant, however, has presented no evidence regarding his education or intelligence.  Further, once SA Perry realized

22

that Defendant did not speak English, he asked if Defendant spoke Spanish.  When Defendant indicated that he spoke Spanish, SA Perry conducted the remainder of the interview in Spanish and, notably, asked in Spanish for Defendant's consent to search.  From the audio recording, it appears that Defendant was able to understand and appropriately respond to each of SA Perry's questions.

Finally, Defendant argues that his consent was not voluntary because of the nature and targeted focus of the questioning, and the intensity of the questioning vis-à-vis other passengers within earshot of Defendant.  Again, the audio recording belies this contention.  The encounter between Defendant and SA Perry lasted for one minute and thirty seconds.  During that time, SA Perry asked basic questions, regarding Defendant's identity, his travel plans, and whether he had luggage with him.  SA Perry's inquiries were neither significantly longer nor more detailed than his inquiries of the other three passengers.  Indeed, SA Perry asked one passenger to lift his shirt.  While SA Perry asked Defendant how long he planned to be in New York and the purpose of that trip, there was nothing in the substance of those inquiries or in the tone in which they were made that would have suggested to Defendant that he was not free to decline SA Perry's request or otherwise terminate the encounter.

Under the totality of the circumstances, a reasonable person would have felt free to decline SA Perry's request for permission to search Defendant's bags, or otherwise terminate the encounter with him.  Accordingly, the government has met its burden of proving that Defendant's consent to search his checked back was given freely and voluntarily.  It thus follows that there is no basis to suppress the evidence discovered pursuant to the search of Defendant's bag.

**CONCLUSION**

Defendant has not met his burden of establishing that SA Perry conducted a search of his bag in violation of the Fourth Amendment.  The government has met its burden of establishing that Defendant's consent to the search of his bag was freely and voluntarily given.  Accordingly, there is no basis to suppress either the evidence discovered pursuant to the search of his bag or his post-arrest statements.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence [Doc. 22] is denied.

Dated this 5th day of January, 2016.

**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**

24