1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW MEXICO

3  _____
                                   )
4  UNITED STATES OF AMERICA,       )    No. 15-CR-1020 MV
           Plaintiff,              )
5                                  )
       vs.                         )    Aspen Courtroom
6                                  )    Santa Fe, New Mexico
   ANGEL IBES DIAZ-RIVERA          )
7          Defendants.             )    October 4, 2016
   _____)    9:54 a.m.
8

9              TRANSCRIPT OF PROCEEDINGS
                      SENTENCING
10      BEFORE THE HONORABLE MARTHA A. VAZQUEZ
          UNITED STATES DISTRICT COURT JUDGE
11

12  APPEARANCES:

13  For the Plaintiff:   JOEL R. MEYERS
                         UNITED STATES ATTORNEY'S OFFICE
                         District of New Mexico
14                       P.O. Box 607
                         Albuquerque, New Mexico  87103
15

16  For the Defendant:   BRIAN A. PORI
                         ASSISTANT FEDERAL PUBLIC DEFENDER
                         111 Lomas Blvd., NW, Suite 501
17                       Albuquerque, New Mexico  87102

18

19

20

21  REPORTED BY:         CARMELA V. McALISTER, CRR, RPR, NM CCR 308
                         United States Court Reporter
22                       100 Federal Avenue
                         Santa Fe, New Mexico  87501
23                       Phone:  505-992-3829
                         Email:  Carmela_McAlister@nmd.uscourts.gov
24

25       Proceedings recorded by mechanical stenography; transcript
    produced by computer.

1                          **INDEX**

2    Court Calls Case                                 TR-3

3    Argument by Mr. Pori                             TR-4

4    Statement to the Court by the Defendant          TR-7

5    Response by Mr. Meyers                           TR-8

6    Reply by Mr. Pori                                TR-15

7    Court's Ruling                                   TR-19

8    Reporter's Certificate                           TR-22

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Angel Ibes Diaz-Rivera
15-CR-1020 MV
October 4, 2016

1          THE COURT:  In the matter of United States v. Angel

2    Diaz-Rivera.

3        May I have appearances, please?

4          MR. MEYERS:  Joel Meyers on behalf of the United States.

5    Good morning, Your Honor.

6          THE COURT:  Good morning, Mr. Meyers.

7          MR. PORI:  Good morning, Your Honor.  Brian Pori for

8    Angel Diaz-Rivera, who appears personally with the assistance of

9    the Court's Spanish interpreter.

10          THE COURT:  Thank you.  Okay.  Mr. Diaz, you are here

11    for sentencing this morning.  Have you had an opportunity to

12    review the presentence report and go over that with your attorney?

13          THE DEFENDANT:  Yes.

14          THE COURT:  All right.  In addition to the presentence

15    report, I have reviewed a sentencing memorandum, objections to the

16    presentence report.  Both of those documents were filed by your

17    attorney.  Did you get a chance to review those documents with

18    your lawyer as well?

19          THE DEFENDANT:  Yes.

20          MR. MEYERS:  Actually, Judge, if you'll excuse me.  The

21    objection was filed by the United States.

22          THE COURT:  I'm sorry, you're right.  The objections to

23    the presentence report, as Mr. Meyers has indicated, were filed by

24    the Government.  Did you review that document as well?

25          THE DEFENDANT:  Yes.

1    THE COURT:  The Probation Department also filed an

2    addendum and a second addendum to the presentence reports.  Did

3    you get a chance to go over those two documents as well?

4    THE DEFENDANT:  Yes.

5    THE COURT:  Okay.  All right.  Those are all the

6    documents that I received.  Was anything else filed on behalf of

7    either party?

8    MR. PORI:  Nothing else was filed, Your Honor.  This

9    morning, I provided your Clerk with just a very brief letter from

10   the Food Services Director at the Torrance County Detention

11   facility.  I don't know if the Court had an opportunity to review

12   that.  I'm sorry for the delay in providing it to the Court.  I

13   just received it yesterday.

14   THE COURT:  I'm sorry, Linda.  I left that on my desk.

15   Thank you.

16   MR. PORI:  I have a copy here.  And I provided a copy to

17   Mr. Meyers.

18   THE COURT:  Thank you.  Thank you.  I have reviewed it.

19   MR. PORI:  Thank you.

20   THE COURT:  You may proceed.

21   MR. PORI:  Thank you, Your Honor.

22   Your Honor, we did, in fact, file an objection to the

23   presentence report, that was that Mr. Diaz-Rivera would qualify

24   for the safety valve.  As reflected in the addendum to the

25   presentence report, Probation agrees that he completed his

1    sufficient debrief and is eligible for a safety valve reduction.

2    That would be the final adjusted offense level to 21 with a

3    criminal history category of I, yields a guideline sentence of 37

4    to 46 months.

5    We also ask the Court to consider a departure based on his

6    family ties and responsibility, his age, and his lack of any

7    significant -- of any criminal history whatsoever.  We believe

8    that all of those things demonstrate that this act was an

9    abhorrent act.  And I think paragraph 15 of the presentence report

10   provides all of the facts, which the Court would need to satisfy

11   that departure, namely this is an individual who was employed for

12   over 21 years as a truck driver in Tijuana, Mexico, but starting

13   in 2013, he couldn't find a job as a truck driver.  He went to

14   work in a factory.  That job was not sufficient to care for his

15   family.  And so as a result, he spent two months searching in vain

16   to try to find a job, until ultimately he was referred to an

17   individual in Tijuana who supposedly had a job as a truck driver.

18   When he went to find out about that job, he was told that he

19   would be paid $800 to transport what he believed to be marijuana

20   from San Diego to New York.  He foolishly agreed to accept that

21   job because he was desperate to earn money.  He was stopped in

22   Albuquerque.  When he was questioned by Agent Perry, he readily

23   consented to a search of his luggage.  He was arrested, and when

24   he was arrested, he told the Court -- he told Agent Perry what is

25   relayed ultimately to the Court in paragraph 15.  And he again

1 related that information during a debrief with the Government.

2       Finally, Your Honor, we think that his status as a deportable
3 alien would justify a departure.  As the Court may know, if he
4 were to receive a sentence of 37 months and he was a United States
5 citizen, given his past history and use of marijuana, he would
6 qualify for participation in the residential drug abuse program.
7 Participation in that program would take a year off of his
8 sentence.  Along with that, it would authorize him for an early
9 release to the halfway house, none of which he's eligible for as a
10 deportable alien.  So in my experience, someone who received a
11 37-month sentence and completed a drug abuse program would
12 probably serve an actual sentence of about 17 months.

13       Consequently, Mr. Diaz faces a sentence virtually double what
14 a similarly-situated United States citizen would face simply by
15 virtue of his status as a deportable alien.  And I'd ask the Court
16 to consider that and perhaps not to depart all the way down to the
17 17 month but to depart in a manner that the Court believes is
18 sufficient.

19       Finally, to address the Government's concern that Mr. Diaz is
20 not a minimal participant, the Sentencing Commission has made it
21 very clear in the last few years that an individual who lacks a
22 proprietary interest in the drugs, who has no knowledge of the
23 criminal enterprise for which they are working, who simply acts as
24 a courier, is, in fact, eligible for a minor to a minimal role
25 reduction.  Again, the key is an individual who has no knowledge

of the enterprise, who has no role in the enterprise beyond being
a courier, and most important, who lacks any proprietary interest
in the drugs.

I don't think, if you accept paragraph 15 as true -- and I
don't think there's any dispute that the Government is challenging
those facts -- Mr. Diaz, in fact, qualifies for all of those
prerequisites for a reduction as a minimal participant.  So we
would ask the Court to impose, at the minimum, a low-end guideline
sentence of 37 months and whatever further departure the Court
would feel is justified given the totality of the sentences --
sentencing circumstances, so that the Court would impose a just
and reasonable sentence that is sufficient but not greater than
necessary to achieve the sentencing aims established by Congress
in 18 U.S.C. Section 3553(a).

And I know Mr. Diaz wanted to address the Court.

THE COURT:  Thank you.

Mr. Diaz?

THE DEFENDANT:  Good morning, Your Honor.  First of all,
I would like to apologize to you and to the United States for
having done what I did.  I was desperate to get money, and I would
like you to consider -- I would like you to consider just what my
attorney has said, to have just a just and fair sentence and for
me to be able to go back to my family and to be able to support
them honestly as I have done in the past.  This has taught me that
I do need to respect the U.S. laws and that I will not do this

1    again.

2          That's all.  Thank you for hearing me.

3          THE COURT:  You're welcome, Mr. Diaz.  Thank you very

4    much for your statement.

5          On behalf of the Government, Mr. Meyers?

6          MR. MEYERS:  Can I use the podium, please, Your Honor?

7          THE COURT:  Yes.  If you don't mind stepping aside.

8    Thank you very much.

9          MR. MEYERS:  First thing's first, Judge.  I'd like to

10   address the Government's objection to the PSR.  As the Court is

11   aware, under the sentencing guidelines, the very beginning,

12   there's two prerequisites in order to find that a role adjustment

13   is appropriate.  First, that there's multiple participants in the

14   offense, and then some differentiation in their relative

15   culpabilities.

16        Now, in order for this role adjustment to apply, it's the

17   Defendant's burden, by a preponderance of the evidence, to

18   demonstrate that the role reduction is appropriate.  The Defendant

19   has wholly failed in that burden, Judge.  And I will point the

20   Court to United States v. Eckhart.  It's a 2009 Tenth Circuit

21   case, 569 F.3d 1263, which talks about how heavily fact-dependent

22   this role adjustment is.  And there was -- in that case, the Court

23   was correct in finding that no role -- the District Court was

24   affirmed in finding no role adjustment applied after the Defendant

25   had presented no evidence apart from his own self-serving

statements for which the Court could find that the role adjustment
was appropriate.

Here, we have absolutely no evidence, Judge. All we have is
Mr. Pori's sentencing memorandum and unsubstantiated facts in the
PSR. So I don't think, even under procedural reasonableness
standards, the Court can find that a role adjustment applies.
Whether it's a minor role adjustment or a minimal role adjustment,
the Defendant has the burden to present evidence, and he has not
at this point done that, Your Honor.

I'd also point the Court to a Sixth Circuit case -- it's a
little bit dated, but I think the premise is important -- United
States v. Kingston, at 922 F.2d 1234. Again, in that case, the
Circuit Court found the District Court erred in finding a role
adjustment applied without hearing any proof from either party in
support of that contention. And that's exactly what's occurred
here, Judge. I think the Circuit looking at this, without having
any evidence, would no doubt have to send it back to this Court
for proper procedural reasonableness when it comes to sentence
here.

Certainly, I think Mr. Pori's arguments could go well for a
variance, but getting in the first step of what the Court is
required to do under 3553(a) is to properly determine the
guidelines. And by applying cavalierly a four-level role
adjustment where it's not appropriate, I think, would amount to
procedural error.

1    Let's talk about the specifics of the case and just couriers

2 in general.  And I know it's cited in my sentencing memorandum,

3 but I think it bears saying that couriers are not entitled to an

4 automatic role adjustment.  Couriers maintain an integral if -- a

5 universally-important role within drug trafficking.  It's not just

6 me saying that.  Judge, I think it's important that Circuits all

7 across the country are saying that.  I'll point the Court to

8 United States v. Santos-Garcia at 313 F.3d 1073.  That's an Eighth

9 Circuit case.  Nichols v. United States, 75 F.3d 1137, a Seventh

10 Circuit case.  I already cited to the Sixth Circuit case, United

11 States v. Kingston.

12    Allow me to pivot to the Second Circuit, also holding the

13 same, that couriers are not entitled to automatic role

14 adjustments.  United States v. Shonubi, S-H-O-N-U-B-I.  It's at

15 998 F.2d 84, out of the Second Circuit.  Ajala v. United States

16 Parole Commission, a Ninth Circuit case, 997 F.2d 651.  United

17 States v. Cacho, an Eleventh Circuit case, 951 F.2d 308.  United

18 States v. Lui, L-U-I, 941 F.2d 844.  A Third Circuit case, United

19 States v. Headly, 923 F.2d 1079.  Fifth Circuit case, United

20 States v. Gallegos, 868 F.2d 711.  All of these standing for the

21 proposition, just because someone comes and says they're a

22 courier, they're entitled to a role adjustment.

23    Mr. Diaz-Rivera's role in this was indispensable.  At this

24 point, we haven't even heard if there were other people involved

25 in this, which would allow for a role reduction to even be

appropriate.  We have nothing more than self-serving statements.
The Court has heard no testimony, has been provided no evidence
other than the PSR, which the Court cannot accept just on face
value without any facts behind it.

Putting all that aside, Your Honor, I will certainly concede
that Defendant has qualified for the safety valve reduction.  I do
believe the four prerequisites are there, as well as the safety
valve debrief, which the Defendant did attend and provide
basically that same information.

Now, let's look at this from kind of the vantage point of
3553(a), because the Government's sentencing request is not going
to change regardless of how the Court calculates the guidelines.
Sure, the Court is well aware of the nationwide heroin epidemic
that this country is facing.  New Mexico has been at ground zero
for that heroin epidemic for generations, particularly Northern
New Mexico, as I know the Court is aware.  What's more insidious
lurking behind that heroin epidemic that's killing tens of
thousands of people each year in the United States -- I would say
a handful of people have probably died of drug overdoses in the
few minutes that I've been speaking so far.  Lurking behind that
is fentanyl, which is 50 times stronger than heroin.  Heroin which
is 100 times stronger than morphine, fentanyl and all of its
derivatives.

As I mentioned in my sentencing memorandum, the amount of
fentanyl that Mr. Diaz-Rivera possessed had enough for 3 million

lethal doses.  That's more than the citizens of the District of New Mexico.  Every day people are being killed as a result of fentanyl, most unaware of its strength and tragic consequences.

Agent Perry was at risk just by handling the fentanyl. Mr. Diaz-Rivera himself was at risk.  Baggage handlers on the bus he was on, other passengers, anyone along the way was at risk of a lethal overdose for that insidious substance that Mr. Diaz-Rivera possessed and intended to distribute.  We're taking his word for it that it was from San Diego to New York.  Anywhere along the way, people were at risk.

And he wants this Court, at least through Mr. Pori's statements, that for 21 years, he was a law-abiding truck driver, supporting his family, and then after only two months, he throws all of that away and jumps basically into the deep end of drug trafficking, because some strangers offered him $800 to bring what he thought was marijuana from San Diego to New York to other strangers.  Does that really make any sense?  $800 for that small amount of marijuana, I don't think anybody in their right mind would pay that much money.

It's very convenient that Mr. Diaz can come up here and say, "I just thought it was marijuana.  Sentence me less.  I didn't know who all these people were."  But is there any evidence to support that?  I think it belies common sense that anybody would pay $800 for somebody to bring, essentially, a couple thousand dollars, at most, worth of marijuana across the country by bus.

1    $800 is a lot of money.

2        Marijuana, as I'd be guessing the Court or basically anybody

3    in this courtroom would know, has quite a distinctive odor.

4    Certainly Mr. Diaz would be aware of such a distinctive odor that

5    it has.  And it not being present, maybe this wasn't marijuana.

6    And maybe he didn't know it was fentanyl.  Maybe it was just some

7    other white powder.

8        But, certainly, I would suggest that the facts and

9    circumstances -- the objective facts and circumstances, as we

10   know, would belie any assertion that Mr. Diaz was just some dupe

11   thinking he was bringing marijuana between two strangers that he's

12   never met after two months of unemployment.

13       Now, Mr. Pori, you know, pleads to the Court here for

14   Mr. Diaz, the victim, that somehow prison is going to be much more

15   difficult for him than other people, and, you know, I would think

16   that Mr. Diaz should vigilantly respect the laws of a country

17   where he's not a citizen for fears that something like this may

18   happen.

19       Now, another thing that Mr. Pori brings up is the RDAP

20   program, Residential Drug and Alcohol Program, that gives many

21   people within the Bureau of Prisons tools that are necessary for

22   when they get outside.  Most people in prison are dealing with

23   substance abuse and alcohol problems.  And it's an intense

24   program, and it does provide a reward to people who participate in

25   it, not just a lifetime reward but a reward as far as those

sentences are concerned.

But this is not something that Mr. Diaz would qualify for. It's not a gift. It's not please give me 9 to 12 months of less time because I say I want to take this program. I don't think he qualifies for it. He doesn't need this program, and lucky for Mr. Diaz that he doesn't. I would turn the Court's attention to paragraph 44 of the PSR, where it talks about substance abuse. It doesn't indicate any substance abuse problems. I mean, how many people does the Court see that are here only because of their substance abuse problems or directly as a result of their substance abuse problems? Mr. Diaz is not one of those people, Judge. He's making an economic choice to deliver a killing agent across the country, not somebody who is in desperate times based upon substance abuse and not clear thinking.

Every day, Judge, I get an e-mail from the Chief Medical Investigator of New Mexico imploring us to do something about the fentanyl problem. In 2015, Judge, there was no fentanyl, elicit fentanyl in New Mexico. Mr. Diaz had the distinction of being the first fentanyl case that we had in the district. And over the last several weeks, not a day has gone by where Dr. Kurt Nolte hasn't e-mailed me with results of toxicology examinations of people that are his patients -- and his patients are all dead because he's a pathologist -- of people overdosing and dying of fentanyl in the District of New Mexico. It is here. And while Mr. Diaz, we can remember him as kind of patient zero for this,

1   the Court is going to see a lot more of these cases here and a lot

2   more of these cases with death resulting.  And I'm only happy to

3   say that that didn't happen here based upon the actions of Agent

4   Perry, nor did it happen anywhere along the United States.

5       And it's almost like -- in preparing for this, the sentence

6   the Government is asking for is a sentence of 87 months, which I

7   think is grounded in the guidelines, as the Government sees them,

8   the high end of that as an appropriate sentence.  I would almost

9   suggest that a variance higher than that would be appropriate, but

10  I do stand by the previous recommendation of an 87 month sentence.

11  I thank you, Judge.

12              THE COURT:  Thank you.

13              MR. PORI:  Your Honor, there's nothing cavalier about

14  applying the role adjustment provided by the United States

15  Sentencing Guidelines.  There's ample evidence to support that

16  role adjustment.

17      Not only are there paragraphs 15 and 16 of the presentence

18  report, not only are those facts undisputed by the Government,

19  other than Mr. Meyers' argument, the Government admits that

20  Mr. Diaz-Rivera qualifies for the safety valve reduction.  The

21  same facts which Mr. Diaz-Rivera related to the Government to

22  qualify for the safety valve reduction are the same facts that

23  Mr. Diaz-Rivera related to Agent Perry, the same facts he related

24  to the probation department in preparing the presentence report,

25  the same facts he gave to the Government during the debrief.  The

1    Government accepts them for the purpose of the debrief but not for

2    purposes of the role reduction.  But I think the reality is that

3    those facts are undisputed, and not just unadorned, but are

4    corroborated by the circumstances of this case.

5        Would the Government have this Court believe that a man who

6    lives in Tijuana, Mexico, with his parents, his wife and his

7    daughter, would all of a sudden shift from being a worker in a

8    *maquiladora* to a purveyor of fentanyl.  The Government cited a

9    litany of cases that talks about the essential role that couriers

10   play in drug distribution, and I'm not arguing that.  But what I

11   am -- all of those cases predate the amendments to the commentary

12   and the guidelines section under 3B1.2.  The Sentencing Commission

13   has reviewed this.  The Sentencing Commission has set the

14   standard.  And that standard is an individual who lacks a

15   proprietary interest in the drugs, who has no knowledge of the

16   drug organization for which he or she is working, can qualify for

17   this role reduction.

18       Those are the recommendations of the Sentencing Commission.

19   Those are the considered opinion of the Sentencing Commission

20   following extensive study and commentary regarding who could

21   qualify for these role reductions.  Those are recent commentary

22   amendments to the guidelines, and those guide not only this Court

23   but the Government and everyone else who's considering, and, in

24   effect, overcome the cases cited by Mr. Meyers.

25       The information that Mr. Diaz-Rivera has consistently given

1    to Probation, to Agent Perry, to the Government in a debrief, is

2    corroborated.  Mr. Meyers is correct.  This is fentanyl.  As the

3    Court may recall, even Agent Perry, one of this district's most

4    experienced drug interdiction officers, did not recognize that

5    this was fentanyl.  He averred under oath in a sworn complaint

6    that it was a mixture of methamphetamine and cocaine, despite the

7    fact that in his experience, as indicated in the motion to

8    suppress, he's never seen a drug distributor mix cocaine and

9    methamphetamine, that that would be irrational to mix those two

10   drugs together.  And yet that was his sworn statement.

11       That proves, if nothing else, that Mr. Diaz was a minor

12   participant, because even someone like Agent Perry was not aware

13   that this was fentanyl.  Even someone like Agent Perry was duped

14   by the nature of this circumstance.  And would the Government

15   truly have us believe, with all that you know, I know, Mr. Meyers

16   knows, about the role of drug couriers on a bus, the owner -- the

17   people who have proprietary interest in the drug, three million

18   doses at a dollar a dose -- and we think it's much more than

19   that -- an owner who has $3 million worth of dope is going to ride

20   the bus and carry his own dope, is going to rise out of the

21   *malquiladora* and become a fentanyl distributor?  No.  It belies

22   all common sense.  Who is the drug -- who is the narco going to

23   put on the bus?  A dupe, a rogue, an individual desperate to make

24   money.

25       Given all of the corroborating circumstances in this case,

there is no doubt that Mr. Diaz was used by drug traffickers in Tijuana to distribute fentanyl. I will not disagree with Mr. Meyers about the scourge of fentanyl. Fentanyl is what killed Prince. Any drug, fentanyl, heroin, methamphetamine, any drug, for those of us who, in our personal life, have struggled in our families and in our communities with drugs, all of those drugs are evil. All of those drugs destroy families. All of those drugs destroy lives. All of those drugs kill slowly or quickly. There's no doubt about that.

        And that's not what you're being asked to do today. You're not being asked to take this gentleman riding on a bus and make him -- put his head on a stick and make him an example to all of New Mexico who are suffering from the scourge of drugs. You are asking to fairly and honestly apply the United States sentencing guideline given the guidance provided by the Sentencing Commission. And if, between paragraph 15 and 16 and the corroborating circumstances, you are convinced by a preponderance of the evidence that Mr. Diaz did not have a proprietary interest in those drugs, was not aware of the organization for which he was working, was not even aware of which drug he was transporting, you may find that he was a minimal participant. And, indeed, absent any further showing from the Government, that's all that you can find given the facts before this Court. So we do ask the Court to impose the minimal participant role and to sentence Mr. Diaz accordingly.

1     The only other thing I would add, Your Honor, is I think it's

2  important, the note that I gave you this morning describing

3  Mr. Diaz, it may seem a simple note about a gentleman who has

4  spent almost two years in custody waiting for this case to be

5  resolved, who has done nothing but work in the kitchen.  But what

6  that note reveals is Mr. Diaz's character.  Not only is he a hard

7  worker, not only is he an individual who has lived in the Torrance

8  County detention facility without a single rule violation of any

9  kind, not only is he a person who's gotten up every day and put on

10  those big rubber boots and waded into the kitchen.  This is who he

11  is.  He is a hardworking man who spent 21 years, who in a foolish

12  attempt to make money for his family, agreed to transport a drug

13  that he didn't even know the nature of that drug.

14     And I think his subsequent conduct, the time he's done in

15  custody, his hard work, his respect for all of the rules, his

16  ability to get along with everyone he meets, is further evidence

17  that this is not a drug trafficker.  This is not a kingpin.  This

18  was a man who made a foolish decision who will pay for it for the

19  rest of his life but who need not pay for it any more than

20  recommended by the Sentencing Commission itself in applying a role

21  reduction.  That's all I have.

22          THE COURT:  Thank you.  Angel Diaz-Rivera is before the

23  Court for sentencing in case number 15-CR-1020.  Pursuant to

24  Booker, this Court must consider the advisory sentencing

25  guidelines as well as each of the additional factors stated in

1  18 U.S.C. 3553(a) in imposing a reasonable sentence that is

2  sufficient but not greater than necessary to comply with the

3  purposes set forth in 3553(a).

4       The Court adopts the presentence report factual findings and

5  finds that the Defendant meets the criteria in 18 U.S.C.

6  3553(f)(1)-(5).  The sentence will be imposed pursuant to 5C1.2 of

7  the guidelines and the applicable guideline range without regard

8  to the statutory minimum sentence.  The offense level is 21 and

9  the criminal history category is I.  The guideline range is 37 to

10 46 months.

11      Pursuant to Section 18 U.S.C. 3553(a)(1)-(7), the Court has

12 determined that there exists the following sentencing factors that

13 warrant a sentence outside the guideline range.  The Court is

14 going to supplement this morning's decision with a written

15 opinion.

16      At this point, the decision of the Court is that, as to

17 indictment 1:15-CR-01020-001, Mr. Angel Ibes Diaz-Rivera will be

18 committed to the custody of the Bureau of Prisons for a term of 30

19 months.  Pursuant to Section 5D1.1(c), the Court is not going to

20 impose a period of supervised release.  The Court recommends that

21 ICE begin removal proceedings during the service of this sentence.

22      Based upon his lack of financial resources, the Court will

23 not impose a fine.  There is a $100 special assessment payable to

24 the United States District Court Clerk's office.

25      Under the terms of the plea agreement, Mr. Diaz, you did

1    waive your right to appeal your final sentence of the Court, so

2    there are no appellate rights.

3        Is there a recommendation for placement?

4            MR. PORI:  Your Honor, we request placement near

5    Tijuana, Mexico, consistent with his status.

6            THE COURT:  The Court will make that recommendation,

7    then.

8        Any questions with regard to the Court's sentence?

9            MR. PORI:  No, Your Honor.

10           MR. MEYERS:  I have one question, Judge.  I think it's

11   certainly implicit within the Court's ruling, but the Court is

12   overruling the United States' objection?

13           THE COURT:  Yes.  The Court is overruling that, but I'd

14   like to have an opportunity to address the arguments more fully

15   than the way I ordinarily do address the 3553(a) factors and some

16   of the case law that you cited.  I don't have copies of any of the

17   cases, and I'd like an opportunity to address them more fully.

18           MR. MEYERS:  Thank you.

19           THE COURT:  Thank you.

20           MR. PORI:  Thank you, Your Honor.

21           THE COURT:  Thank you.

22   **(Court in recess at 10:27 a.m.)**

23

24

25

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3  _____

                          )

4 UNITED STATES OF AMERICA,   )    No. 15-CR-1020 MV

        Plaintiff,      )

5                         )

     vs.                )

6                         )

   ANGEL IBES DIAZ-RIVERA,    )

7        Defendant.      )

  _____)

8

9          CERTIFICATE OF OFFICIAL COURT REPORTER

10     I, Carmela V. McAlister, CRR, RPR, New Mexico CCR #306,

11 Federal Official Realtime Court Reporter, in and for the United

12 States District Court for the District of New Mexico, do hereby

13 certify that pursuant to Section 753, Title 28, United States

14 Code, that the foregoing is a true and correct transcript of the

15 stenographically reported proceedings held in the above-entitled

16 matter on October 4, 2016, and that the transcript page format is

17 in conformance with the regulations of the Judicial conference of

18 the United States.

19 Dated this 13th day of October 2016.

20

21        /s/

   _____

22 CARMELA V. McALISTER, CRR, RPR, NM CCR #306

   United States Court Reporter

23 106 S. Federal Place

   Santa Fe, New Mexico  87501

24 Phone:  505-992-3829

   Email:  Carmela_McAlister@nmd.uscourts.gov

25