# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                    15-cr-1020-MV

ÁNGEL IBES DÍAZ RIVERA,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Ángel Ibes Díaz Rivera's Sentencing Memorandum, filed July 26, 2016, (Doc. 42), and the United States' Objection to the Presentence Report and Sentencing Recommendation, filed August 15, 2016 (Doc. 46). The Court held a sentencing hearing on October 4, 2016. (Doc. 51.) At the sentencing hearing, the Court accepted the Plea Agreement (Doc. 37), the factual findings of the Presentence Investigation Report (Doc. 39), and the First and Second Addenda to the Presentence Investigation Report (Docs. 48 and 50). *See* (Doc. 52 at 20). At that time, the Court overruled the United States' objection to the Presentence Investigation Report. The Court sentenced Mr. Díaz to thirty months of incarceration. (*Id.* at 20–21.)

At the sentencing hearing, the Court did not impose a term of supervised release under U.S.S.G. § 5D1.1(c). *See* (Doc. 52 at 20). However, in reviewing the judgment, the Court now notes that Section 5D1.1(c)'s instruction that "[t]he [C]ourt ordinarily should not impose a term of supervised release . . . [if] the defendant is a deportable alien who likely will be deported after imprisonment" only applies where the criminal statute <u>does not</u> require a term of supervised release. In this case, the applicable criminal statute requires that the Court impose a three-year term of supervised release as a result of Mr. Díaz' conviction for possession with intent to distribute fentanyl. *See* 21 U.S.C. § 841(b)(1)(C) ("any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior

conviction, impose a term of supervised release of at least 3 years in addition to such term of imprisonment").

The Court now supplements the sentence as follows: Mr. Díaz shall be placed on supervised release for a period of three years. The only condition that will apply to his term of supervised release is that he cannot reenter the United States without legal authorization from the United States government.

At the sentencing hearing, the Court noted that it would provide a written opinion to supplement its decision to apply a four-level reduction for Mr. Díaz' minimal role in the offense under U.S.S.G. § 3B1.2(a) and its decision to vary below the advisory sentencing guidelines range under 18 U.S.C. § 3553(a). *See* (Doc. 52 at 21). The Court provides that opinion below.

## I.    Factual Background

At sentencing, the Court accepted the factual findings in the Presentence Investigation Report (PSR). *See* (Doc. 39) and (Doc. 52 at 20). Neither party objected to the PSR's factual findings. The Court reviews the facts in the PSR here, as well as additional facts that Mr. Díaz presented and that the Court finds credible.

At the time of his arrest for this offense, Mr. Díaz was 39 years old. (Doc. 39 at 2.) Before then, he had never been arrested. He has no criminal history. (*Id.* at ¶¶ 32–37.) For 21 years—more than half of his life—he had worked as a truck driver, delivering construction materials throughout Baja California, Mexico. He typically worked independently as a contractor and earned between $150.00 and $200.00 each week. (*Id.* at ¶ 46.) He used his earnings to support his family, including Marta Montoya, his 33-year-old wife of nine years, and their nine-year-old daughter. (*Id.* at ¶¶ 41 and 66.) Ms. Montoya now works in a bakery. (*Id.* at ¶ 41.) Most recently, between 2013 and 2015, he hauled trailers for the Muñoz factory in Tijuana, earning about $944.67 each month. (*Id.* at ¶ 47.)

When there was not enough work with the Muñoz factory, Mr. Díaz left his job. (*Id.*) For the first time in more than two decades, he was unemployed. For two months, he looked for work again as a truck driver. Someone referred him to a man in Tijuana who was seeking a driver. But when he applied for the

job, he learned that the man was actually looking for people to transport marijuana from San Diego, California, to New York. (Doc. 42 at 4.) Desperate for money to support his family, he agreed to a one-time job transporting drugs on a Greyhound bus. (Doc. 39 at ¶¶ 15–17.) The man in Tijuana promised to pay him $800 for the one-time trip. (*Id.* at ¶¶ 15–16.)

On March 13, 2015, the bus on which Mr. Díaz was traveling from San Diego made a routine stop at the Greyhound Bus Station in Albuquerque, New Mexico. DEA agents were at the station, checking arriving buses. In the cargo area of the bus, the agents saw a piece of expandable luggage. According to the agents, the luggage was of the kind that people often use to transport drugs. The tag on the expandable luggage showed that it belonged to Mr. Díaz. (*Id.* at ¶ 13.)

One of the DEA agents boarded the bus and spoke with Mr. Díaz, who said that he had a piece of luggage in the cargo area of the bus, as well as a backpack. He consented to a search of his backpack. The agent searched it, finding no narcotics. The agent then asked for and obtained Mr. Díaz' consent to search his checked-on luggage in the cargo area of the bus. A search revealed that the luggage had a false compartment with two boards in it. In opening the false compartment, the agent found a clear, heat-sealed plastic bundle between the two boards. The appearance of the package was consistent, in the agent's experience, with the appearance a package of illegal narcotics. The agent arrested Mr. Díaz. He immediately confessed that he believed that he had been carrying marijuana and would have been paid $800 to transport it to New York City. He also disclosed that he knew little about the man in Tijuana who had offered him the one-time drug courier job. (*Id.* at ¶ 13–16.)

Later, a lab test of the substance in the heat-sealed package revealed that the controlled substance was not marijuana. Nor was it a mixture of methamphetamine and cocaine, as the DEA agent who arrested Mr. Díaz had sworn in an affidavit that it was, based on the results of a field test. *See* (Doc. 1-1 and Doc. 52 at 17). Rather, it was 2.99 net kilograms of fentanyl. (Doc. 52 at ¶ 15–16.)

The Court underscores these facts: nothing in the record supports the view that Mr. Díaz was any more than a very low-level, one-time courier who had no knowledge of the larger criminal enterprise

3

above him and had no decision-making authority. After searching for work as a truck driver for two months, he applied for a driving job with a man in Tijuana who instead offered him a one-time job of transporting marijuana from San Diego to New York. (Doc. 42 at 4.) All of the facts in the record suggest that in a single act of economic desperation, Mr. Díaz agreed to transport what he believed to be marijuana—a substance that turned out to be fentanyl, a drug that even the experienced DEA agent who arrested him misidentified after a field test—in a single piece of checked-in luggage on a cross-country bus trip. Furthermore, in fully and honestly debriefing with the United States government, Mr. Díaz provided all of the information and evidence that he had about the charged offense—which was, apparently, very little. *See* (Doc. 46 at 3 and Doc. 48 at 1.)

Mr. Díaz has been in continuous custody since the DEA agent arrested him on March 13, 2015. (*Id.* at 1.)

## II.    Procedural Background and Sentencing Arguments

On January 22, 2016, Mr. Díaz entered into a plea agreement with the United States in which he pleaded guilty to the Indictment (Doc. 13), which charged that he unlawfully, knowingly, and intentionally possessed with intent to distribute a Schedule II controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). (Doc. 37.) The Indictment charges him with possession with intent to distribute "a Schedule II controlled substance" and the Plea Agreement specifies that the controlled substance was fentanyl. (Docs. 13 and 37.)

In preparation for sentencing, the United States Probation Office filed a Presentence Investigation Report (PSR) on May 23, 2016. (Doc. 39.) Mr. Díaz filed a Sentencing Memorandum on July 26, 2016, in which he made one formal objection to the PSR. (Doc. 42.) The United States also filed one objection to the PSR and made a recommendation for sentencing on August 15, 2016. (Doc. 46.) The United States Probation Office responded to Mr. Díaz and the United States in a First Addendum and Second Addendum to the Presentence Investigation Report on August 30, 2016, and September 26, 2016, respectively. (Docs. 48 and 50.)

4

The Court held a Sentencing Hearing on October 4, 2016. At the hearing, the Court considered arguments from Mr. Díaz and the United States about the appropriate sentence under the advisory guidelines and 18 U.S.C. § 3553(a). At that time, the Court imposed a sentence of 30 months of incarceration. (Doc. 52 at 20–21.)

### a.   Mr. Díaz' Sentencing Arguments and Request

Mr. Díaz made the following arguments in support of his request for a sentence of 30 months of incarceration. (Doc. 42 at 11.)

### i.   Objection to the PSR and the United States' and the Probation Office's Responses

In his sentencing memorandum, Mr. Díaz made a single objection to the PSR. (Doc. 42 at 2.) He urged that he qualified for a two-level reduction from his base offense level under U.S.S.G. § 2D1.1(b)(17) because, he argued, he met all of the criteria for the so-called "safety valve" set out in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2. Specifically, Mr. Díaz noted that he did not have more than one criminal history point, he did not use violence or a dangerous weapon when he committed the offense, the offense did not result in death or serious bodily injury, he was a minimal participant in the charged offense, and he truthfully provided to the Government all information and evidence he had about the charged offense. (Doc. 42 at 2–3.) The Court notes that Section 5C1.2(a)(4) of the advisory guidelines does not require that a person be a "minimal participant," but rather requires that the person "was not an organizer, leader, manager, or supervisor of others in the offense" and "was not engaged in a continuing criminal enterprise[.]" Application note 5 defines such a person as one who did not receive an adjustment for an "aggravating role" under Section 3B1.1.

The U.S. Probation Office and the United States agreed that Mr. Díaz would be eligible for the two-level reduction under U.S.S.G. § 2D1.1(b)(17). (Doc. 46 at 3 and Doc. 48 at 1.) The Probation Office noted that at the time it had issued the PSR, Mr. Díaz had not adequately debriefed with the United States, as required under Section 5C1.2(a)(5), but the Probation Office later confirmed that he had in fact fully debriefed, making him eligible for the two-level reduction. (Doc. 48 at 1.)

### ii. Mr. Díaz' Sentencing Arguments

Mr. Díaz made several arguments about "specific offender characteristics" in support of his requests for departures under U.S.S.G. § 5H1.1 (age), § 5H1.5 (employment record), and § 5H1.6 (family ties and responsibilities). He urged that the same facts also supported a variance below the advisory sentencing guidelines range under 18 U.S.C. § 3553(a). He also requested a departure or variance because of his status as a deportable person and a departure because of his "extraordinary acceptance of responsibility." (Doc. 42 at 7–11.)

With respect to his age, employment, and family ties, Mr. Díaz noted that before he committed this crime, he had never been involved in the criminal justice system in the United States or in Mexico. He was 39 when he committed the crime, which, he urged, meant that his offense was an "aberrant act" and that "he is less likely to recidivate." (*Id.* at 7.) Mr. Díaz also argued that despite the fact that he confronted limited opportunities for employment in Baja California, where rates of poverty are high, and had a limited education, he nevertheless maintained stable employment as a truck driver there for 21 years. (*Id.* at 8.) He urged that his incarceration will cause his family to suffer great hardship, given that he is the primary source of his family's economic support. His crime was a "desperate attempt to earn money to support his family while he was unemployed." (*Id.* at 8–9.)

Mr. Díaz also argued that his status as a deportable person is a basis for a departure or a variance. (*Id.* at 9.) He noted that because of his immigration status, he will face an "unwarranted increase in the severity of his sentence" given that "[h]e will not be eligible for early release, he will not be able to be assigned to a minimum security prison[,] and he will not be able to obtain any sentence reduction based on his participation in a residential drug abuse program." (*Id.*)

Finally, he argued that a further departure or variance is warranted given his "extraordinary acceptance of responsibility." (*Id.* at 10.) Specifically, from the moment that the DEA agent first encountered Mr. Díaz, he (Mr. Díaz) "cooperated with the investigation of this offense[,]" consenting to a search of his belongings and making a confession, thereby waiving his rights under the Fourth and Fifth

Amendments. (*Id.* at 10–11.)

Mr. Díaz asked the Court to reduce his offense level by two levels under Section 2D1.1(b)(17) and then to depart or vary to a sentence of 30 months. (*Id.* at 11.) Again, after Mr. Díaz filed his Sentencing Memorandum and before sentencing, the Probation Office also agreed that he was eligible for the two-level reduction under Section 2D1.1(b)(17). (Doc. 48 at 1.)

At sentencing, Mr. Díaz' counsel and Mr. Díaz addressed the Court. Counsel provided an oral reply to the United States' Objection to the Presentence Report and Sentencing Recommendation (Doc. 46), discussed further below. Counsel urged that Mr. Díaz was a minimal participant in the offense and entitled, as the PSR recommended, to a four-level reduction from his offense level under U.S.S.G. § 3B1.2(a). (Doc. 52 at 6.) Counsel argued that Mr. Díaz qualified as a minimal participant under the U.S. Sentencing Commission's guidance because he had no "proprietary interest in the drugs" and "no knowledge of the criminal enterprise for which [he was] working[,]" and because he was working as a simple "courier." (*Id.* at 6–7.)

In addressing the Court, Mr. Díaz apologized for having committed the offense and explained that he was "desperate to get money[.]" He said that he understood that he needs to respect U.S. laws, he planned to return to his family in Mexico so that he could support them, and he promised that he would never attempt to traffic drugs again. (Doc. 52 at 7–8.)

**b.   The United States' Sentencing Arguments and Request**

The United States made the following arguments in support of its request for a sentence of 87 months of incarceration and a term of five years of supervised release. (Doc. 46 at 1.)

**i.   Objection to the PSR and Mr. Díaz' and the Probation Office's Responses**

The United States made one objection to the Presentence Report. (Doc. 46 at 3.) Specifically, the government objected to the U.S. Probation Office's recommendation that Mr. Díaz receive a four-level reduction for having a "minimal" role in the offense under U.S.S.G. § 3B1.2. (*Id.*) The United States urged that the Probation Office had "merely applied the adjustment" without justifying its application.

(*Id.*) The government also argued that Mr. Díaz had not met his burden of proving the propriety of the role adjustment.

In support of its argument, the government cited to four controlling Tenth Circuit cases that the Court discusses in its analysis below. (*Id.* at 3–4) (*United States v. Ayers*, 84 F.3d 382 (10th Cir. 1996); *United States v. Carter*, 971 F.2d 597 (10th Cir. 1992); *United States v. Martinez*, 512 F.3d 1268 (10th Cir. 2008)); *see also* (Doc. 52 at 8) (citing to *United States v. Eckhart*, 569 F.3d 1263 (10th Cir. 2009), another controlling case, discussed below).

The government alleged that after the DEA arrested Mr. Díaz, he "provided a self-serving statement that he was unaware of the exact contents of the package he was delivering." (Doc. 46 at 3) What is more, the government urged, even assuming that Mr. Díaz was merely a courier, his status as a courier does not entitle him to a "minimal" role adjustment. Couriers, the government argued, are indispensable to drug trafficking organizations. (*Id.* at 3–4.)

As discussed above, Mr. Díaz argued at sentencing that he was entitled to minimal role adjustment. The Probation Office, too, in its response to the United States, noted that Mr. Díaz "acted on the opportunity to make quick money[,]" "believed that he was carrying marijuana[,]" and had no knowledge of "the structure or enterprise of the drug trafficking business." (Doc. 50 at 1.)

### ii. Sentencing Arguments

The United States then considered several of the factors under 18 U.S.C. § 3553(a) in urging the Court to sentence Mr. Díaz at the high end of the advisory Guidelines range. The United States specifically recommend a sentence of 87 months, using an offense level of 27 (again, because the government disagrees that Mr. Díaz is entitled to a four-level minimal role adjustment).

### A. Seriousness of the Offense

With respect to the seriousness of the offense under 18 U.S.C. § 3553(a)(2)(A), the United States urged that the country is in a "fentanyl crisis" and that the amount of fentanyl that Mr. Díaz was carrying was the equivalent of "[three] million potentially lethal doses[.]" (Doc. 46 at 7.)

8

**B.  History and Characteristics of Mr. Díaz**

With respect to Mr. Díaz' history and characteristics under 18 U.S.C. § 3553(a)(1), the United

States argues that Mr. Díaz "cho[se] the citizens of the United States as the potential victims of his crime"

and that in committing the offense he was looking for "'quick money'" "at the expense of the many

people who suffer from substance abuse in the United States[.]" (Doc. 46 at 7–8) (internal citation

omitted). The government also rejected Mr. Díaz' arguments in support of a variance based on his status

as a deportable person and his acceptance of responsibility. (*Id.* at 8.)

**C.  Respect for the Law and Just Punishment**

The government argued that a high-end sentence of 87 months was "needed 'to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense.'" (*Id.* at 9) (citing 18 U.S.C. § 3553(a)(2)(A)).

**D.  Protecting the Public**

Finally, the government argued that a high-end sentence was necessary to protect the public under

18 U.S.C. § 3553(a)(2)(B). (Doc. 46 at 9.)

At sentencing, the United States reiterated its argument that Mr. Díaz is not eligible for the four-

level minimal role adjustment under U.S.S.G. § 3B1.2(a). The United States cited to a Tenth Circuit case,

*Eckhart*, 569 F.3d 1263, and multiple cases from other circuits in support of its argument that Mr. Díaz'

courier status does not make him eligible for a role adjustment.

**III.     Sentencing Analysis**

**a.   Sentencing after *Booker***

In *United States v. Booker*, the Supreme Court excised two provisions from the United States

Sentencing Guidelines, including "the provision that requires sentencing courts to impose a sentence

within the applicable Guidelines range (in the absence of circumstances that justify a departure)[.]" 543

U.S. 220, 259 (2005). In doing so, the Court made the Guidelines advisory, freeing sentencing courts to

consider the Guidelines, but to also consider other factors, in imposing a sentence that is "sufficient, but

9

not greater than necessary, to comply with the purposes [of sentencing]" that are set forth in Section 3553(a)(2). *See* 18 U.S.C. § 3553(a).

Indeed, the *Booker* Court specifically directed sentencing courts to consider factors under Section 3553(a) in imposing a sentence: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing." 543 U.S. at 261.

Section 3553(a) provides:

The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
    (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement—

    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy

> statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>
> (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Again, in imposing a sentence, the Court must consider <u>all</u> of the factors listed in § 3553(a), <u>and</u> must ensure that the sentence is sufficient, but not greater than necessary, to achieve the purposes of sentencing set out in § 3553(a)(2). *See Gall v. United States*, 552 U.S. 38, 51 (2007) (In reviewing a sentence for abuse of discretion, the appellate court "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.").

Section 1B1.1 instructs the sentencing court about the order in which it must apply the Guidelines and § 3553(a) factors in imposing a sentence. Section 1B1.1 provides:

> (a) The court shall determine the kinds of sentence and the guideline range as set forth in the guidelines (see 18 U.S.C. § 3553(a)(4)) by applying the provisions of this manual in the following order, except as specifically directed:
>
> 1. Determine, pursuant to §1B1.2 (Applicable Guidelines), the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction. See §1B1.2.
> 2. Determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two in the order listed.
> 3. Apply the adjustments as appropriate related to victim, role, and obstruction of justice from Parts A, B, and C of Chapter Three.
> 4. If there are multiple counts of conviction, repeat steps (1) through (3) for each count. Apply Part D of Chapter Three to group the various counts and adjust the offense level accordingly.
> 5. Apply the adjustment as appropriate for the defendant's acceptance of responsibility from Part E of Chapter Three.
> 6. Determine the defendant's criminal history category as specified in Part A of Chapter Four. Determine from Part B of Chapter Four any other applicable adjustments.
> 7. Determine the guideline range in Part A of Chapter Five that corresponds to the offense level and criminal history category determined above.

11

8.   For the particular guideline range, determine from Parts B through G of Chapter Five the sentencing requirements and options related to probation, imprisonment, supervision conditions, fines, and restitution.

\

(b)   The court shall then consider Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence. See 18 U.S.C. § 3553(a)(5).

(c)   The court shall then consider the applicable factors in 18 U.S.C. § 3553(a) taken as a whole. See 18 U.S.C. § 3553(a).

### b.   Mr. Díaz is Sentenced to Thirty Months of Incarceration and Three Years of Supervised Release.

Using the instructions in Section 1B1.1, the Court makes the following determinations in imposing a sentence of 30 months of incarceration and supplementing the sentence with three years of supervised release.

### 1.   Mr. Díaz' Offense of Conviction—Possession with Intent to Distribute Fentanyl—Corresponds with Section 2D1.1.

Section 2D1.1 applies where, as here, the offense of conviction is for "[u]nlawful [m]anufacturing, [i]mporting, [e]xporting, or [t]rafficking ([i]ncluding [p]ossession with [i]ntent to [c]ommit [t]hese [o]ffenses); [a]ttempt or [c]onspiracy[.]" U.S.S.G. § 2D1.1.

### 2.   Mr. Díaz' Base Offense Level is 30.

The Plea Agreement states that Mr. Díaz' base offense level is 32 under U.S.S.G. § 2D1.1(c)(4). That base offense level reflects the quantity and type of drugs that Mr. Díaz was carrying: he was responsible for "[a]t least 1.2 kilograms[,] but less than 4 kilograms of fentanyl[.]" (Doc. 37 at ¶13(a).) However, the Court considers the full guideline, not simply the Drug Quantity Table, in determining Mr. Díaz' base offense level. Under U.S.S.G. § 2D1.1(a)(5)(A)–(B)(i), Mr. Díaz' base offense level is actually 30, not 32. This is because the Court is awarding an adjustment under Section 3B1.2 of the guidelines for Mr. Díaz' mitigating role in this offense. The Court discusses the mitigating role further below.

To reiterate, although Mr. Díaz' offense level in the Drug Quantity Table is 32 because of the amount of fentanyl he was carrying (2.99 net kilograms), the Court reduces his offense level by two levels to 30 because of the adjustment under Section 3B1.2 for his mitigating role in this offense. *See* U.S.S.G. §

2D1.1(a)(5)(A)–(B)(i) (providing for a two-level reduction from the base offense level for people who receive mitigating role adjustments and whose base offense level is 32 under the Drug Quantity Table).

### 3. Mr. Díaz receives a two-level reduction under U.S.S.G. § 2D1.1(b)(17) because he meets the safety-valve criteria.

Mr. Díaz objected to the Presentence Report's failure to award a two-level reduction under U.S.S.G. § 2D1.1(b)(17). (Doc. 42 at 2–3.) He argued that he was eligible for the reduction because he met all of the criteria for the "safety valve" in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2. As noted above, both the U.S. Probation Office and the United States agree with Mr. Díaz that he is eligible for this reduction. *See* (Doc. 46 at 3 and Doc. 48 at 1). The parties also stipulated in the Plea Agreement that Mr. Díaz would receive a two-level reduction from his base offense level if he established his eligibility for each of the criteria in 18 U.S.C. § 3553(f)(1)–(5) and U.S.S.G. § 5C1.2. (Doc. 37 at ¶ 5.)

Section 2D1.1(b)(17) provides that "[i]f the defendant meets the criteria set forth in subdivisions (1)-(5) of subsection (a) of § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), decrease [the base offense level] by 2 levels." Section 5C1.2(a) incorporates the criteria in 18 U.S.C. § 3553(f)(1)–(5)—what is known as the safety-valve statute. The safety-valve statute "provides a narrow exemption from mandatory minimum statutes to a certain class of nonviolent, low-level drug offenders." Philip Oliss, *Mandatory Minimum Sentencing: Discretion, the Safety Valve, and the Sentencing Guidelines*, 63 U. Cin. L. Rev. 1851, 1855 (1995).

The safety-valve criteria, which are identical in Section 5C1.2(a) and 18 U.S.C. § 3553(f)(1)–(5), are as follows:

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines before application of subsection (b) of §4A1.3 (Departures Based on Inadequacy of Criminal History Category);

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4)  the defendant was not an organizer, leader, manager, or supervisor of others in the

offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

In this case, (1) Mr. Díaz has no criminal history; (2) he did not use violence, threats of violence, or a firearm or other dangerous weapon in connection with this offense; (3) this offense resulted in no death or serious bodily injury to any person; (4) he was not an organizer, leader, manager, or supervisor of others in the offense; and (5) he truthfully provided to the United States all information and evidence he has about the offense. Again, both the United States and the U.S. Probation Office agree that he meets these criteria. *See* (Doc. 46 at 3 and Doc. 48 at 1).

Because Mr. Díaz meets all five of the safety-valve criteria he receives a two-level reduction from his base offense level. *See* U.S.S.G. § 2D1.1(b)(17).

### 4. Mr. Díaz receives a four-level reduction under U.S.S.G. § 3B1.2(a) because he was a minimal participant in the offense.

In the Presentence Report, the U.S. Probation Office recommended a four-level reduction from Mr. Díaz' base offense level because he was a "minimal participant" in the offense. (Doc. 39 at ¶ 24.) Section 3B1.2(a) of the Guidelines provides: "Based on the defendant's role in the offense, decrease the offense level as follows: (a) If the defendant was a minimal participant in any criminal activity, decrease by **4** levels." Application Note 3(C) to Section 3B1.2 describes the decision to grant a reduction based on a defendant's mitigating role as a "[f]act-[b]ased [d]etermination" that the Court must make "based on the totality of the circumstances." Note 3(C) suggests several factors—a "non-exhaustive list"—that the Court may consider:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

(ii) the degree to which the defendant participated in planning or organizing the criminal

14

activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity

And Application Note 4 to Section 3B1.2 describes a minimal participant (as opposed to a minor participant):

Subsection (a) [the section providing for a four-level reduction for minimal participants] applies to a defendant described in Application Note 3(A) who plays a minimal role in the criminal activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

Application Note 3(A) notes that Section 3B1.2 generally applies to people who are "[s]ubstantially [l]ess [c]ulpable than [the] [a]verage [p]articipant" and it "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." "[P]articipant" in these sections does not refer to a person who was convicted of a crime, but rather "a person who is criminally responsible for the commission of the offense." *See* 3B1.1, Application Note 1. The Tenth Circuit "ha[s] held that a 'participant' for purposes of § 3B1.2 need not be charged with the offense of conviction to be considered as a participant under the Guidelines. *See United States v. Bowen*, 437 F.3d 1009, 1019 n. 5 (10th Cir.2006); *see also Martinez*, 512 F.3d at 1276 n. 3 ('Charged only with the amount of drugs he personally transported, Martinez of course was not categorically precluded from receiving a minor participant adjustment.') (citing USSG § 3B1.2 cmt. n. 3(A))." *United States v. Salas*, 756 F.3d 1196, 1207 (10th Cir. 2014).

As discussed above, the United States objected to the application of the four-level minimal participant reduction. *See* (Doc. 46 at 3–4). In its formal, written objection, the United States argued that Mr. Díaz has the burden to prove his eligibility for the four-level minimal participant reduction. (*Id.* at 3),

citing *Ayers*, 84 F.3d 382 and *Carter*, 971 F.2d at 599. The United States urged that Mr. Díaz had not met his burden. (Doc. 46 at 3.)

In its written objection and oral argument at sentencing, the United States also argued that even assuming that Mr. Díaz is a courier, that status—as a courier—would not entitle him to a minimal or even minor role adjustment under Section 3B1.2. (*Id.* at 4), citing *Martinez*, 512 F.3d at 1276; *United States v. Santos Garcia*, 313 F.3d 1073 (8th Cir. 2002); *Nichols v. United States*, 75 F.3d 1137 (7th Cir. 1996); *United States v. Shonubi*, 998 F.2d 84 (2d Cir. 1993) and (Doc. 52 at 8–10), citing *Eckhart*, 569 F.3d 1263; *United States v. Kingston*, 922 F.2d 1234 (6th Cir. 1990); *Santos Garcia*, 313 F.3d 1073; *Nichols*, 75 F.3d 1137; *Shonubi*, 998 F.2d 84; *Ajala v. U.S. Parole Comm'n*, 997 F.2d 651 (9th Cir. 1993); *United States v. Cacho*, 951 F.2d 308 (11th Cir. 1992); *United States v. Lui*, 941 F.2d 844 (9th Cir. 1993); *United States v. Headly*, 923 F.2d 1079 (3d Cir. 1991); *United States v. Gallegos*, 868 F.2d 711 (5th Cir. 1989).

Again, in his oral argument at sentencing, Mr. Díaz' counsel urged that under the U.S. Sentencing Commission's guidance from "the last few years[,]" a person, like Mr. Díaz, "who lacks a proprietary interest in the drugs, who has no knowledge of the criminal enterprise for which they are working, who simply acts as a courier, is, in fact, eligible for a minor to a minimal role reduction[.]" (Doc. 52 at 6–7.)

In considering the United States' objection in its Second Addendum to the Presentence Report, the Probation Office rejected it. (Doc. 50 at 1.) The Probation Office noted, "[i]n [his interview with] the [DEA] agent, there was no information to suggest that the drugs were [Mr. Diaz'] or that he knew more about the structure or enterprise of the drug trafficking business." (*Id.*)

The Court now considers each issue and controlling case law that the United States raised in its objection, as well as Mr. Díaz' argument.

First, with respect to the burden, the United States is correct that Mr. Díaz must prove by a preponderance of the evidence that he is eligible for the four-level reduction under Section 3B1.2. In *Ayers*, one of the cases that the United States cited in its sentencing brief, the Tenth Circuit noted that "[u]nder USSG 3B1.2, it is the defendant's burden to establish by a preponderance of the evidence that he

or she is entitled to an offense reduction." 84 F.3d at 383. In *Carter*, too, the Tenth Circuit noted that the defendant "ha[s] the burden of establishing by a preponderance of the evidence that [he or] she was a minimal or minor participant." 971 F.2d at 599.

While defendants have the burden of proving their eligibility for a role reduction by a preponderance of the evidence, then, "Section 3B1.2 'vests the district court with discretion to grant a base offense level reduction if it finds a defendant is less culpable relative to other participants in a given offense.'" *Ayers*, 84 F.3d at 383 (quoting *United States v. Santistevan*, 39 F.3d 250, 254 (10th Cir. 1994)).

Second, contrary to the United States' position, Mr. Díaz <u>has</u> met his burden of establishing by a preponderance of the evidence that he was a minimal participant in this offense.

At the outset, the Court notes, as the government has urged, that Tenth Circuit case law is very clear that "'courier status alone does not entitle [a defendant] to an adjustment for a minor or minimal role.'" *See United States v. Funez*, 615 F. App'x 492, 494 (10th Cir. 2015)  (quoting *United States v. Salas*, 756 F.3d 1196, 1207 (10th Cir. 2014). But the operative word here is "alone." That is to say, while one's status as a courier alone is not sufficient in the Tenth Circuit to make one eligible for a downward role adjustment under Section 3B1.2, it can be considered in combination with other factors—factors that Mr. Díaz highlighted in his sentencing arguments.

Using the factors the Commission has suggested in Application Note 3(C), it is clear that Mr. Díaz is eligible for the mitigating role adjustment: he was a one-time, low-level courier of drugs who did not have any information about "the scope and structure of the criminal activity" in which he was participating. He did not plan or organize the criminal activity: after he applied for what he thought would be a job as a truck driver, a man in Tijuana instead offered him the job of transporting marijuana on a bus between San Diego and New York, a job that he accepted out of severe economic desperation. The only criminal act that he engaged in was carrying drugs on a bus. He did not exercise decision-making authority. He merely agreed to transport drugs on a single cross-country trip in exchange for a one-time payment of $800. In other words, he was paid to perform a single task: transport the drugs on a bus. The

only benefit he was to receive from this transaction was $800. He had no proprietary interest in the drugs and, indeed, did not know the type or quantity of drugs he was carrying. *See* U.S.S.G. § 3B1.2, Application Note 3(C). There is no evidence that Mr. Díaz planned to engage in couriering drugs again. In illustrating a case in which a sentencing court should consider a mitigating role adjustment, the Sentencing Commission described in general terms a fact scenario that describes Mr. Díaz' role in this offense: "[f]or example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." *Id.* Here, Mr. Díaz was offered $800 not for "certain tasks," but for only one: to take drugs on a bus.

Again, it is clear in the cases that the government has cited both in its brief and at the sentencing hearing that Mr. Díaz' status as a courier <u>alone</u> does not make him eligible for a § 3B1.2 role reduction under Tenth Circuit law. But as discussed above, <u>many</u> other factors in combination—factors specifically enumerated in the non-exhaustive list in the Guidelines Application Note 3(C) and not related to his status as a courier—make him eligible for a minimal role adjustment.

The Court now turns to the case law. Again, because the Tenth Circuit has not adopted a "'per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier[,'] *United States v. Rangel–Arreola*, 991 F.2d 1519, 1524 (10th Cir.1993)[,]" the sentencing court's "decision whether to grant an adjustment under § 3B1.2 must therefore 'turn[ ] on the defendant's culpability relative to other participants in the crime.' *Rangel–Arreola*, 991 F.2d at 1524 (emphasis added)." *Martinez*, 512 F.3d at 1276.

In *Martinez*, two co-defendants transported meth. The district court was not persuaded by Mr. Martinez' argument that he should be eligible for a role adjustment because he was less culpable than his co-defendant and that both co-defendants were mere "mules" in a drug trafficking organization. There, "both defendants were present and agreed to transport the methamphetamine for $2,000, and both were entrusted with a large quantity of drugs. Both defendants fled the scene after they were stopped by law

18

enforcement to avoid apprehension." *Id.* at 1276. The district court found that Mr. Martinez was no less culpable than his co-defendant. Mr. Díaz' case is distinguishable. Here, Mr. Díaz raises several arguments about his lack of knowledge about the greater criminal enterprise, lack of proprietary interest in the drugs, lack of decision-making authority, and the fact that he was to be paid $800 to perform a single task. The Tenth Circuit mentioned none of these factors in its decision to affirm the district court. Moreover, the Martinez defendants fled from law enforcement. Mr. Díaz immediately and fully cooperated with the DEA agents.

In *Eckhart,* two co-defendants, both of whom pleaded guilty to possession with intent to distribute meth, claimed that they were each less culpable than the other and deserving of a role adjustment under § 3B1.2. In that case too, the Tenth Circuit emphasized that the sentencing court's decision about whether to apply a role adjustment depends on the particular facts of each case. 569 F.3d at 1276. Again, the Court is persuaded here by the facts. Mr. Díaz fully debriefed with the government. Based on the debriefing, the information in the PSR, and Mr. Díaz' arguments at sentencing, he did not have knowledge about the greater criminal enterprise of which he was a part, he lacked a proprietary interest in the drugs, he lacked decision-making authority, and he was to be paid $800 to perform a single task. In *Eckhart,* the Tenth Circuit mentioned none of these factors in its decision to affirm the district court.

In *Ayers*, the defendant rented an apartment. A known drug dealer helped Mr. Ayers to pay the rent for the apartment and used the apartment "to prepare and store crack cocaine, contact potential buyers, and store money." *Ayers*, 84 F.3d at 384. The district court found that Mr. Ayers "played a significant role in facilitating Mr. Markland's [the dealer's] drug trafficking scheme." *Id.* In affirming the district court's denial of a mitigating role reduction, the Tenth Circuit noted, "Mr. Ayers's admitted knowledge of Mr. Markland's drug dealing, his accompanying Mr. Markland in the collection of debts, and his allowing Mr. Markland to use the apartment are all factors supporting the inference that Mr. Ayers knowingly permitted Mr. Markland to use the apartment to sell drugs." *Id.* Here, again, Mr. Díaz

performed a single act once in a drug trafficking operation, about which he knew little. The only financial incentive he received was a one-time offer of $800.

Finally, in *Carter*, the defendant tried to transport 42 pounds of marijuana on a train. Despite the fact that the government and Ms. Carter had stipulated to a four-level minimal role adjustment, the Probation Office did not make a recommendation for a role adjustment and the district court found that Ms. Carter "had failed to prove by a preponderance of the evidence that she was a minimal or minor participant[.]"*Carter*, 971 F.2d at 600. Here, the Probation Office recommended a four-level adjustment based on the facts in this case about Mr. Díaz' role in this offense and the Court agrees that Mr. Díaz has shown by a preponderance of the evidence that he was a minimal participant.

### 5. Mr. Díaz receives a three-level reduction under U.S.S.G. § 3E1.1(a)–(b) because of his acceptance of responsibility.

The Plea Agreement provides that at the time he entered into it, Mr. Díaz "ha[d] clearly demonstrated a recognition and affirmative acceptance of personal responsibility for [his] criminal conduct." Because he has continued to "clearly demonstrate acceptance of responsibility for his offense[,]" under U.S.S.G. § 3E1.1(a), he "is entitled to a reduction of two levels from the base offense level as calculated under the sentencing guidelines[.]" (Doc. 37 at ¶ 13(b).) Under the plea agreement and under U.S.S.G. § 3E1.1(b), he is entitled to a reduction of an additional offense level. (Doc. 37 at ¶ 13(b).)

Mr. Díaz receives a three-level reduction for acceptance of responsibility.

### 6. Mr. Díaz' total offense level is 21.

Again, under the Drug Quantity Table in and as described in the Plea Agreement, Mr. Díaz' base offense level would have been 32, but for his eligibility for the role adjustment. Because he had a minor role in the offense, an issue that is discussed below, his base offense level is 30. *See* (Doc. 39 at ¶ 21) and U.S.S.G. § 2D1.1(a)(5)(B)(i). Mr. Díaz receives a two-level reduction from his base offense level under U.S.S.G. § 2D1.1(b)(17) because he meets the safety-valve criteria. He receives a four-level reduction from his base offense level under U.S.S.G. § 3B1.2(a) because he was a minimal participant in the

20

offense. Finally, Mr. Díaz receives a three-level reduction from his base offense level under U.S.S.G. § 3E1.1(a)–(b) because of his acceptance of responsibility. This yields a total offense level of 21.

### 7. Mr. Díaz has no criminal history and is in Criminal History Category I.

The Presentence Report indicates that Mr. Díaz has no criminal history. (Doc. 39 at ¶¶ 32–37.) Before the DEA arrested him for this offense, he had never been arrested. (*Id.*) Therefore, he has no criminal history points and is in Criminal History Category I.

### 8. Mr. Díaz' Advisory Guidelines Range

As discussed above, Mr. Díaz' total offense level is 21. Because he has no criminal history, he is in Criminal History Category I. This yields an advisory guidelines range of 37 to 46 months of incarceration.

### 9. Sentencing Requirements and Options Related to Probation, Incarceration, Supervision Conditions, Fines, and Restitution

Under the statute, because Mr. Díaz committed a felony, he is eligible for a term of probation of "not less than one nor more than five years[.]" 18 U.S.C. § 3561(c)(1). However, because his advisory guidelines range falls within Zone D of the sentencing table, he is not eligible for probation. U.S.S.G. § 5B1.1(a), Application Note 2 ("Where the applicable guideline range is in Zone C or D of the Sentencing Table . . ., the guidelines do not authorize a sentence of probation.") and U.S.S.G. § 5C1.1 (describing the imposition of a term of imprisonment).

The statutory maximum term of incarceration for Mr. Díaz' offense is 20 years. 21 U.S.C. § 841(a) (possession with intent to distribute) and 21 U.S.C. §  841(c) (providing for "a term of imprisonment of not more than 20 years"). Again, the advisory Guidelines range is 37 to 46 months.

As noted above, at the time of sentencing, the Court did not impose a term of supervised release under U.S.S.G. § 5D1.1(c). *See* (Doc. 52 at 20). However, in reviewing the judgment, the Court now notes that Section 5D1.1(c)'s instruction that "[t]he [C]ourt ordinarily should not impose a term of supervised release . . . [if] the defendant is a deportable alien who likely will be deported after imprisonment" only applies where the criminal statute <u>does not</u> require a term of supervised release. In

this case, the applicable criminal statute requires that the Court impose a three-year term of supervised release as a result of Mr. Díaz' conviction for possession with intent to distribute fentanyl. *See* 21 U.S.C. § 841(b)(1)(C) ("any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 3 years in addition to such term of imprisonment"); *see also United States v. Gonzalez*, 543 F. App'x 416 (5th Cir. 2013) ("Section 5D1.1(c) does not apply where the term of supervised release is required by statute.").

The statutory maximum fine is $1,000,000. 21 U.S.C. § 841(b)(1)(C) (providing for "a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $1,000,000 if the defendant is an individual"). However, based on Mr. Díaz' lack of financial resources, the Court is not imposing a fine.

Finally, this was a non-violent crime. Mr. Díaz harmed no one, although the Court recognizes the potential was there due to the dangerousness of the drug.  Restitution does not apply in this case. *See* 18 U.S.C. § 3663 (describing restitution).

### 10. Specific Offender Characteristics and Departures

As noted above, Mr. Díaz moved the Court to grant departures under U.S.S.G. § 5H1.1 (age), U.S.S.G. § 5H1.5 (employment record), and U.S.S.G. § 5H1.6 (family ties and responsibilities). He urged that the same facts also supported a variance below the advisory sentencing guidelines range under 18 U.S.C. 3553(a). The Court declines to depart for the following reasons, but, instead, grants a downward variance under 18 U.S.C. § 3553(a) as discussed below.

With respect to Mr. Díaz' age, in its Section 5H1.1 Policy Statement, the Sentencing Commission recommends that "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." At the time of sentencing, Mr. Díaz was 40 years old. For this reason, the Court declines to depart based on his age.

With respect to his employment record, in its Section 5H1.5 Policy Statement, the Sentencing

Commission recommends that "[e]mployment record is not ordinarily relevant in determining whether a departure is warranted." While Mr. Díaz' employment record prior to this offense is very impressive, particularly given the lack of employment opportunities in his community and his limited level of education, the Court declines to depart based on his employment.

Likewise, with respect to his family ties and responsibilities, in its Section 5H1.6 Policy Statement, the Sentencing Commission recommends that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." While the Court recognizes Mr. Díaz' strong commitment to his spouse and their nine-year-old daughter and his efforts to provide for them, the Court declines to depart based on his family ties and responsibilities.

Mr. Díaz also seeks a departure based upon his status as a deportable person, particularly given that he will not have the same benefits as non-deportable people have in prison. While the Court considers his status and the negative consequences of his status under Section 3553(a), the Court declines to grant a departure on these grounds.

Finally, Mr. Díaz requests a departure based on his extraordinary assistance. While the Court has considered this factor in granting reductions under the safety valve and for acceptance of responsibility, the Court declines to grant a departure.

### 11. 18 U.S.C. § 3553(a) Factors, Taken as a Whole

Finally, the Court considers all of the factors under 18 U.S.C. § 3553(a). For the following reasons, the Court grants a downward variance to thirty months of incarceration.

The first § 3553(a) factor requires the sentencing court to consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Here, Mr. Díaz attempted to transport 2.99 kg of fentanyl on a bus from San Diego to New York. Mr. Díaz had never been involved in any criminal activity before his arrest for this offense. He agreed to transport drugs in a one-time act of desperation when he was unemployed and distressed about providing for his family. Moreover, he believed that what he was carrying was marijuana. Even the DEA agent who conducted the field test did not correctly identify the

23

drug as fentanyl in the field.

The first § 3553(a) factor also requires the sentencing court to consider "the history and characteristics of [Mr. Díaz]." 18 U.S.C. § 3553(a)(1). This offense was Mr. Díaz' first and only criminal act. He had never been arrested prior to this offense. Before he committed this offense, he had worked for more than half of his life—21 years—as a truck driver, delivering construction materials throughout Baja California, Mexico. He typically worked independently as a contractor and earned between $150.00 and $200.00 each week. He used his earnings to support his family, including Marta Montoya, his 33-year-old wife of nine years, and their nine-year-old daughter. Most recently, between 2013 and 2015, he hauled trailers for the Muñoz factory in Tijuana, earning about $944.67 each month. But then there was not enough work with the Muñoz factory. Mr. Díaz left his job. For the first time in more than two decades, he was unemployed. Desperate for money to support his family, he agreed to a one-time job transporting drugs on a Greyhound bus. Given Mr. Díaz' lack of criminal history, substantial employment history, and the age at which he committed his first and only crime, a sentence below the guidelines range is appropriate. *See, e.g., United States v. Roybal*, No. CR 12-3182 JB, 2016 WL 3129624, at *41 (D.N.M. May 24, 2016) (Browning, J.).

With respect to the seriousness of the charged offense and the related need to promote respect for the law and to provide just punishment, 18 U.S.C. § 3553(a)(2)(A), the charge in this case is serious, but Mr. Díaz' role in the offense was very limited. The Court recognizes, as the United States urges, that fentanyl is a deadly drug that has significantly contributed to the opioid epidemic in the United States. (Doc. 46 at 7.) Fentanyl consumption leads to a serious risk of overdose and death. (*Id.*) A sentence of thirty months provides just punishment. Mr. Díaz has otherwise shown great respect for the law and has never engaged in any other criminal conduct. The Court found Mr. Díaz to be sincere in his apology to the Court and in his recognition of the need to respect the laws of the United States.

With respect to deterrence, 18 U.S.C. § 3553(a)(2)(B), the Court found Mr. Díaz credible in his apology and his commitment to returning to support his family in Mexico. Again, he had never

committed a crime in his life before this one. He has been away from his family for a very long time. Before his arrest, he worked for more than two decades as a truck driver, for which he earned a very modest wage. Mr. Díaz is rendered deportable and cannot reenter the United States. If he does, he will face the possibility of a harsh sentence for illegal reentry. All of these factors indicate that Mr. Díaz will be deterred from engaging in any other act of criminal conduct and a below-Guidelines sentence is warranted.

With respect to protecting the public, 18 U.S.C. § 3553(a)(2)(C), Mr. Díaz' crime is nonviolent and did not result in any harm. This was a one-time act of economic desperation and there is no indication that a sentence of more than 30 months is necessary to protect the public.

With respect to providing Mr. Díaz with needed education or vocational training, medical care, or other correctional treatment, 18 U.S.C. § 3553(a)(2)(C), Mr. Díaz spent 21 years working as truck driver delivering construction materials in Baja California. He does not require additional educational or vocational training. Moreover, Mr. Díaz would not be eligible for programs that are otherwise available for non-deportable people in the U.S. Bureau of Prisons. *See* (Doc. 42 at 9).

With respect to avoiding unwarranted sentencing disparities, 18 U.S.C. § 3553(a)(6), a sentence of 30 months appropriately reflects the individual circumstances of this case: that Mr. Díaz committed this act out of severe economic desperation and after having worked for more than two decades in steady employment for which he received a very modest wage; that he will not benefit from any of the programs in the Bureau of Prisons because of his immigration status; that his spouse and their daughter have surely suffered greatly during his long period of incarceration; that his apology to the Court and his commitment to returning to work in Mexico and respecting the laws of the United States were sincere; and that he will no longer be able to enter the United States.

With respect to the need to provide restitution, 18 U.S.C. § 3553(a)(7), as noted above, this was a non-violent crime. Mr. Díaz harmed no one. Restitution does not apply in this case. *See* 18 U.S.C. § 3663 (describing restitution).

### 12. Imposition of Sentence

For the foregoing reasons, Mr. Díaz is sentenced to thirty months of incarceration. As the Court noted above, the Court now supplements the sentence imposed at the sentencing hearing as follows: Mr. Díaz shall be placed on supervised release for a period of three years. The only condition that will apply to his term of supervised release is that he cannot reenter the United States without legal authorization from the United States government.

### IV.    Conclusion

At the sentencing hearing on October 4, 2016, the Court sentenced Mr. Díaz to a below-Guidelines sentence of thirty (30) months. With this sentence, the Court overruled the United States' objection to the four-level reduction from Mr. Díaz' offense level under U.S.S.G. § 3B1.2(a) and granted a variance under 18 U.S.C. § 3553(a). The Court now supplements the sentence as follows: Mr. Díaz shall be placed on supervised release for a period of three years. The only condition that will apply to his term of supervised release is that he cannot reenter the United States without legal authorization from the United States government. The Court has described its findings and the bases for its variance in this Memorandum Opinion and Order.

In summary, for the reasons above, the Court **GRANTS** Mr. Díaz' Sentencing Memorandum, filed July 26, 2016, (Doc. 42) and **OVERRULES** the United States' Objection to the Presentence Report, filed August 15, 2016, (Doc. 46).

DATED this 17th day of March, 2017.

_____
MARTHA VÁZQUEZ
**UNITED STATES DISTRICT JUDGE**

JAMES BRAUN, JOEL R. MEYERS,                     BRIAN PORI
AND KRISTOPHER N. HOUGHTON              FEDERAL PUBLIC DEFENDER
*U.S. Attorney's Office*                                *Attorney for Mr. Díaz*

26